CASE 38—INDICTMENT—NOVEMBER 18.

## Fain v. The Commonwealth.

APPEAL FROM JESSAMINE CIRCUIT COURT.

1. The court should have permitted the appellant to prove that he had from his infancy been afflicted with *somnolentia* or *somnambulism*.
2. Also, that his children had been sick, and he had recently lost much sleep in waiting upon them.
3. The alleged threats against appellant should have been admitted.
4. If appellant, when he shot deceased, was unconscious, or so nearly so that he did not know what he was doing, nor what was being done to him, and supposed he was being assailed, and resisting an attempt to take his life or to do him great bodily harm, he should be acquitted.
5. If, when he fired the first, or first and second shots, he was so far unconscious that he supposed he was resisting a dangerous assault upon him, and regained his consciousness before he fired the second or third shots, his guilt or innocence will depend upon whether he believed in good faith that he was in danger of losing his life or sustaining great bodily injury.

H. A. ANDERSON AND BRECKINRIDGE & SHELBY FOR APPELLANT.

1. The court erred in refusing to admit evidence that appellant was afflicted with a disease called *somnambulism*.

Fain v. The Commonwealth.

2. It should have admitted evidence that his children had been sick, and he, in waiting upon them, had recently lost sleep. (Hamilton's Lectures on Metaphysics, vol. 1, 319; Wharton & Stille's Med. Jour., sec. 482; Maudsly on Insanity, 484; Brown's Med. Juris. Insanity, 15; 14 Bush, 398; 3 B. Mon., 579.)

3. The court erred in instructing the jury. (Terrill v. The Commonwealth, 13 Bush, 255; 10 Bush, 499.)

No brief for appellee.

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

The appellant was indicted and tried for the murder of Henry Smith, a porter at the Veranda Hotel at Nicholasville. He was found guilty of manslaughter, and sentenced to confinement in the penitentiary for two years. From that judgment he prosecutes this appeal.

The prisoner and his friend George Welch went to the Veranda Hotel after dark on an evening in February. The weather was cold, and there was snow upon the ground. They sat down in the public room and went to sleep. In a short time Welch awoke, and, finding the deceased in the barber's shop, in the next room, called for a bed for himself and the prisoner, to pay for which he handed the deceased a bill. Welch attempted to awaken the prisoner by shaking him, but failed. He then told the deceased to wake him up. The deceased shook him for some time, and failing to wake him, said he believed he was dead. Welch said no, he is not; wake him up. The deceased shook him harder and harder until the prisoner looked up and asked what he wanted. The deceased said he wanted him to go to bed. The prisoner said he would not, and told the deceased to go away and let him alone. The deceased said it was getting late, and he wanted to close the house, and still holding the prisoner by the coat, the latter either raised or was lifted up, and, as he arose, he threw his hand to his side as if to draw a weapon. A by stander said to him,

Fain v. The Commonwealth.

don't shoot; but without noticing or giving any sign that he heard what was said, he drew a pistol and fired. The deceased instantly grappled him to prevent him from shooting again, but a second shot was fired almost immediately, and a third soon followed. After the third shot was fired the prisoner was thrown down and held by the deceased. The prisoner, while being held on the floor, hallooed *hoo-wee* very loud two or three times, and called for Welch. He asked the deceased to let him get up; but the deceased said, "If I do, you will shoot me again." The prisoner said he would not, and the deceased released his hold and allowed him to get up. Upon getting up the prisoner went out of the room with his pistol in his hand. His manner was that of a frightened man. He said to a witness, "Take my pistol and defend me;" said he had shot some one, but did not know who it was, and upon being told who it was, expressed sorrow for what he had done.

It did not appear that the prisoner knew or had ever seen the deceased before. There was not the slightest evidence of a motive on his part to injure the deceased, nor does there appear to have been anything in what the deceased did or the manner of doing it which, the facts being understood, was calculated to excite anger, much less a desire to kill him. At that time the prisoner was about thirty-three years of age, and he introduced evidence to show that he had been a man of good character and of peaceable and orderly habits.

He also offered to prove that he had been a sleep-walker from his infancy; that he had to be watched to prevent injury to himself; that he was put to sleep in a lower room, near that of his parents, and a servant-man was required to sleep in the room to watch him; that frequently, when aroused from sleep, he seemed frightened, and attempted

violence as if resisting an assault, and for some minutes. seemed unconscious of what he did or what went on around. him; that sometimes, when partly asleep, he resisted the servant who slept in the room with him, as if he supposed the servant was assaulting him.

He also offered to prove by medical experts that persons. asleep sometimes act as if awake; that they walk, talk, answer questions, and do many other things, and yet are unconscious of what they do; that with many persons there is a period between sleeping and waking in which they are unconscious, though they seem to be awake; that loss of sleep, and other causes which produce nervous depression or mental anxiety, may produce such a state of unconsciousness between sleep and waking; and that for some days previous. his children had been afflicted with a dangerous disease, and he had, in consequence, lost much sleep.

He likewise offered to prove that his life had been threatened by a person living near where he had been on business. during the day, and that he had on that morning borrowed the pistol with which he shot the deceased, and had stated at. the time that he was required to go near to where the person lived who had threatened him, and he wanted the pistol to defend himself in case he was attacked.

The court rejected all this proffered evidence, and the. prisoner excepted.

All the modern medico-legal writers to whose writings we have had access, recognize a species of mental unsoundness. connected with sleep, which they commonly treat of under the general head of *Somnambulism.*

In speaking of this peculiar affection, Dr. Ray says:

"Not only is the power of locomotion enjoyed, as the etymology of the term signifies, but the voluntary muscles.

Fain v. The Commonwealth.

are capable of executing motions of the most delicate kind. Thus, the somnambulist will walk securely on the edge of a precipice, saddle his horse, and ride off at a gallop; walk on stilts over a swollen torrent; practice airs on a musical in- strument; in short, he may read, write, run, leap, climb, and swim, as well as, and sometimes even better than, when fully awake." (Ray's Med. Jur., sec. 495; Wharton & Stille, Taylor, and Brown announce similar views; Wharton &. Stille on Med. Jur., sec. 149 *et seq.*; Taylor's Med. Jur., page 176; Med. Jur. of Insanity, sec 328 *et seq.*)

Under the general head of mental unsoundness connected with sleep, Wharton & Stille group somnolentia, somnambu- lism, and nightmare.

They define somnolentia "to be. the lapping over of a. profound sleep into the domain of apparent wakefulness,'" and say that it produces a state of involuntary intoxication, which for the time destroys moral agency. (Med. Jur., section 151.)

The writings of medical and medico-legal authors contain accounts of many well-authenticated cases in which homi- cides have been committed while the perpetrator was either asleep or just being aroused from sleep, and in commenting on these cases, Brown, in his Medical Jurisprudence of In- sanity, uses this language:

SEC. 338. "Indeed, there are very many cases in which the confused thoughts of awakening consciousness have led to disastrous consequences. And this is to be accounted for by the fact that there is a state between sleeping and waking when the thoughts of the dreamer have as much reality as. the facts he is assured of by his senses."

Taylor recognizes the existence in many persons of a half conscious state when suddenly aroused from sleep, and says.

there is no doubt that the mind is at such a time subject to hallucinations and illusions, but seems to doubt whether such a state of the mind can continue long enough for the commission of a homicide.

These authorities, corroborated as they are by common observation, are sufficient to prove that it is possible for one, either in sleep or between sleeping and waking, to commit homicide, either unconsciously or under the influence of hallucination or illusion resulting from an abnormal condition of the physical system.

Ray says: "As the somnambulist does not enjoy the free and rational exercise of his understanding, and is more or less unconscious of his outward relations, none of his acts during the paroxysms can rightfully be imputed to him as crimes." (Med. Jur., sec. 508.)

Brown, and Wharton & Stille express substantially the same views.

But we are not under the necessity of relying wholly upon writers on medical jurisprudence as authority upon this point. It is one of the fundamental principles of the criminal law that there can be no criminality in the absence of criminal intention, and when we ascertain from medical experts or otherwise that there is such a thing in nature as somnolentia and somnambulism, the task of the jurist is ended, so far as relates to the right of one accused of crime to offer evidence conducing to prove that he committed the act imputed to him as a crime while in a paroxysm of somnolentia or somnambulism. In criminal trials, the jury must try every pertinent question of fact the evidence conduces to prove. When evidence is offered, the sole question for the court is, will it conduce to prove any fact material in the case? and if the law gives an affirmative response, the evidence must

Fain v. The Commonwealth.

be admitted.   If, as claimed, the appellant was unconscious when he fired the first shot, it cannot be imputed to him as a crime.   Nor is he guilty if partially conscious, if, upon being partially awakened, and finding the deceased had hold of him and was shaking him, he imagined he was being attacked, and believed himself in danger of losing his life or of sustaining great bodily injury at the hands of his assailant, he shot in good faith, believing it necessary to preserve his life or his person from great harm.   In such circumstances, it does not matter whether he had reasonable grounds for his belief or not.   He had been asleep, and could know nothing of the surrounding circumstances.   In his condition he may have supposed he was assailed for a deadly purpose, and if he did, he is not to be punished because his half-awakened consciousness deceived him as to the real facts, any more than if, being awake, the deceased had presented a pistol to his head with the apparent intention to shoot him, when in fact he was only jesting, or if the supposed pistol, though sufficiently resembling a deadly weapon to be readily mistaken for one, was but an inoffensive toy.

The evidence conducing to prove that the appellant's children had been sick, and that he had recently lost considerable sleep, should have been admitted as conducing to show that, at the moment of being aroused, he may have been unconscious, or partly so, and, therefore, unable readily to understand the real circumstances of his situation.

The physicians introduced would have proved, as the appellant avowed, that loss of sleep and mental anxiety each has a tendency to develop a predisposition to *somnolentia*, or sleep drunkenness, as it is otherwise called, and in this they would but corroborate the opinions of medical jurists.

We are also of the opinion that the offered evidence in regard to the alleged threats against the prisoner should have been admitted.

The central position of the defense was, that the prisoner fired the fatal shots while partially or wholly unconscious, under the false impression that he was being assaulted by the deceased.

His effort was to show that he was subject to a peculiar affection which made him imagine, when suddenly aroused from sleep, that he was being assaulted by the person arousing him, and that under that impression he was accustomed to make unconsciously violent resistance; that at such times he mistook the mere creatures of his imagination for real facts and circumstances.

If he had been threatened, it was natural, or at least not unnatural, especially while near to the person who had threatened him, that the threat should make such an impression on his mind as would contribute to develop with more than ordinary force the predisposition to imagine himself assaulted and to make resistance, and particularly so when, on being aroused, he found himself in the hands of a stranger, by whom he was being persistently and violently shaken.

We do not see any legitimate bearing the fact that he borrowed the pistol could have upon any of the issues in the case, and what he said was not admissible to prove that he had been threatened.

As the case must go back for a new trial, and it is, in some of its features, one of first impression, we will, at the risk of being prolix, consider the law applicable to it somewhat in detail.

There are several phases in which the case presents itself, all of which should be submitted to the jury.

1. If the prisoner, when he shot the deceased, was unconscious, or so nearly so that he did not comprehend his own situation and the circumstances surrounding him, or that he supposed he was being assailed, and that he was merely resisting an attempt to take his life or do him great bodily injury, he should be acquitted—in one case, because he was not legally responsible for any act done while in that condition, and in the other, because he is excusable on the ground of self-defense; for although it is clear that he was not in danger, and had no reasonable grounds to believe he was, yet if, through derangement of his perceptive faculties, it appeared to him that he was in danger, he is as free from punishable guilt as if the facts had been as he supposed them to be.

2. If he was so far unconscious when he fired the first shot, or the first and second, that he supposed he was defending himself against a dangerous assault, and regained consciousness before he fired the second or third shot, the question of guilt or innocence will depend upon whether he then believed in good faith that he was in danger of losing his life or of sustaining great bodily injury.

It was not necessary, under the circumstances, that he should have reasonable grounds to believe he was in danger. In the view we are now taking of the case we are supposing he was unconscious or partly so when he fired the first shot. If so, when he regained consciousness and found himself seized and held by a stranger who was struggling to overpower him, it would be unreasonable to expect him to wait until he could discover the purpose or apparent purpose of his antagonist, as it might have appeared to those who, in

the full possession of their faculties and senses, had witnessed the whole affair.

But if he fired after he became conscious, and did not at the time in good faith believe he was in danger of loss of life or great personal injury, he is guilty of either murder or manslaughter—murder if he was actuated by malice, manslaughter if he acted without malice.

3. Although he may have been so far conscious when he fired the first shot as to understand what he was doing, yet, if he did not understand the purpose of his assailant, and believed he was attempting to inflict on him great personal injury, he should be acquitted, for, as already remarked, if, in consequence of a derangement of his perceptive faculties, or from being suddenly aroused from sleep and finding the deceased holding and shaking him, he believed he was in great danger of losing his life or suffering great personal injury, although there was in fact no danger, and, those who had witnessed the affair, had no reason to apprehend danger, he is no more guilty than if there had been actual danger.  Such a case admits of no other test than the good faith of the prisoner, to be judged of by the jury.

4. If the prisoner was conscious of what he was himself doing, and that the purpose of the deceased was merely to wake him up, and the prisoner shot him simply because he did so, he is guilty of either murder or manslaughter: murder if the shooting was malicious, manslaughter if without malice.

If the prisoner is and has been afflicted in the manner claimed, and knew, as he no doubt did, his propensity to do acts of violence when aroused from sleep, he was guilty of a grave breach of social duty in going to sleep in the public room of a hotel with a deadly weapon on his person, and

merits, for that reckless disregard of the safety of others, some degree of punishment, but we know of no law under which he can be punished. Our law only punishes for overt acts done by responsible moral agents. If the prisoner was unconscious when he killed the deceased, he cannot be punished for that act, and as the mere fact that he had the weapon on his person and went to sleep with it there did no injury to any one, he cannot be punished for that.

Instructions two and three, given by the court, are inconsistent with the foregoing views, and should not have been given.

For the errors indicated, the judgment is reversed, and the cause is remanded for a new trial upon principles not inconsistent with this opinion.