## J. W. MORRIS *v.* COMMONWEALTH.

[Abstract Kentucky Law Reporter, Vol. 6—370.]

**Jurisdiction of Kenton Circuit Court.**
Under the provisions of the Act of March 9, 1878, the Kenton Circuit Court at Independence has exclusive jurisdiction of all criminal offenses committed in Kenton County outside the corporate limits of the city of Covington and of the first Magisterial district.

**Self-defense in Murder Case.**
To excuse a person who takes the life of another upon the ground of self-defense, the accused must have believed and had reasonable grounds to believe that he was at the time in imminent danger of great bodily harm or loss of life at the hands of the person slain and that he had no other apparently safe means.

**Instruction of the Court.**
Whether an instruction given in a murder case upon the hypothesis of murder is authorized by the evidence or not is not an error that a defendant can complain of where he is found guilty of a lower degree of homicide only.

APPEAL FROM CAMPBELL CRIMINAL COURT.

November 20, 1884.

OPINION BY JUDGE LEWIS:

Appellant having been tried under an indictment for murder and convicted of manslaughter prosecutes this appeal.

He was first indicted in the Kenton Criminal Court at Covington. But a statement having been made and filed by the Attorney for the Commonwealth that the proof would show the offense for which he was indicted was committed at a place in Kenton County outside the City of Covington and outside the First Magisterial District, the court made an order for the transmission of a copy of the indictment and all the original papers in the case to the Clerk of the Kenton Circuit Court at Independence. And at the February term, 1883, of the last named court a second indictment was found charg-

ing him with the same offense. But at a subsequent term upon his motion the venue was changed to the Campbell Criminal Court where he was tried under the indictment and the judgment appealed from rendered.

While the case was pending in the Kenton Circuit Court appellant moved to set aside the indictment found in that court because the first one found against him was undisposed of in the Kenton Criminal Court, and also filed a plea denying for the same reason the jurisdiction of the court. But the motion was overruled, and a general demurrer to the plea sustained. And that ruling of the court is now made a ground for reversal.

If the Kenton Criminal Court at Covington did not have jurisdiction of the offense with which appellant was charged the indictment found there was a nullity, and section 167 of the Criminal Code made it the duty of the court to order a copy of the indictment and all the original papers transmitted to the Clerk of the Court in the state having jurisdiction. And if the Kenton Circuit Court at Independence had jurisdiction then clearly the trial and conviction under the indictment found in that court is a bar to any proceeding against appellant under the indictment found in the Kenton Criminal Court, whether the latter has jurisdiction or not. And it was consequently not necessary for a formal order to be made setting aside the indictment first found, before proceeding under the other.

The question then arises whether the Kenton Circuit Court had jurisdiction.

By the second section of an act entitled "An act to fix the terms and regulate the jurisdiction and proceedings of the Kenton Circuit Court at Independence in the 12th Judicial District" approved March 9, 1878, it is provided that "the Circuit Court of said County at Independence shall have exclusive chancery, common-law and criminal jurisdiction of all actions and proceedings now pending or which shall hereafter be commenced, brought or instituted under existing laws in the County of Kenton outside the City of Covington and outside the First Magisterial District, being the District in which Healon is situated," etc.

Though the language of that section is not as full and explicit as it might have been, yet when it is considered in reference to the object of the act, and in connection with other sections, it is

manifest that the legislature intended to confer upon the Kenton Circuit Court at Independence exclusive jurisdiction of all criminal offenses committed in Kenton County outside the corporate limits of the City of Covington and of the Frist Magisterial District.

Under section 5, article 1, chapter 28, General Statutes, the Kenton Criminal Court had previous to the Act of March 9, 1878, ex-clusive jurisdiction in criminal and penal proceedings in Kenton County. But the first section of that act provides in terms "that all acts or parts of acts authorizing or requiring the holding of the Criminal Court at Independence is hereby repealed."

It is further provided by section 5 of the Act that "all the general laws of this state relating to Circuit Courts are hereby made applicable to said Circuit Court at Independence."

Thus the act expressly repeals all laws conferring jurisdiction upon the Kenton Criminal Court sitting at Independence. It pre-scribes the territorial boundary within which the Kenton Circuit Court sitting at Independence, the county-seat, shall have exclusive criminal jurisdiction. And by making all general laws relating to Circuit Courts applicable to that court the jurisdiction conferred is plenary.

There being then in our opinion no question of the offense charged having been committed in that part of Kenton County where the jurisdiction of the Kenton Circuit Court at Independence is ex-clusive, appellant was properly tried under the indictment found in tht court, and it was not error to overrule the motion to set it aside.

It appears that the homicide occurred on the afternoon of Sep-tember 22, 1882, at Morning View, a station on the Kentucky Central Railroad, when appellant had arrived on the train some time before.

Previous to that date, as shown by evidence introduced in his behalf, appellant was the agent and correspondent at that station of a newspaper, and upon information derived from another person caused to be published in the paper a letter in which it was stated that one of the citizens was in the habit of beating his wife and that neighbors had been compelled to go to her assistance, but no name was mentioned in the letter.

Some time thereafter, in August, Scanlon, the deceased, said to a witness that appellant had interfered in his family and he would kill the damned son-of-a-bitch the first time he caught him, and

upon the arrival on the train of appellant at the station about two weeks before the homicide, deceased called the attention of another witness to him, and said he intended to blow a hole through him the first time he crossed his path. Both these threats were communicated to appellant before the homicide.

On the day of the killing after remaining at the station some time, where he met and was in the company of deceased several times, appellant left for his residence going on foot along the railroad track. But after having gone some distance he discovered that it was necessary for him to return to the station, and on his way back passed by the deceased who was at work on the railroad, and as he passed spoke to him and he replied, but it does not appear what was said by either of them. Soon after appellant passed him deceased also started down the track following him to the station and in a short time they met on the platform between the main and side tracks of the railroad where deceased was heard to apply the words "son-of-a-bitch" to appellant, whereupon the latter stepped from the platform and motioning deceased off with his hand, fired two shots at him in quick succession with a pistol taken from his valise, deceased falling at the second fire and dying from the wound received in about two hours. No assault or other movement was made by the deceased on that occasion, except a witness states he had his hand on his hip when shot, but for what purpose does not appear.

Appellant offered to prove on the trial that he was a person of nervous temperament and disposition and constantly apprehensive that attacks would be made upon him. But the court sustained the objection made and refused to permit the evidence to go to the jury, and in our opinion this ruling was correct. For it was not pertinent to the issue of appellant's guilt or innocence. But it is argued that the excluded evidence was proper to be considered by the jury in determining whether or not by reason of this constitutional derangement of his perceptive faculties, as it is improperly termed by counsel, it appeared to appellant at the time he fired he was in danger of losing his life or of great bodily harm at the hands of deceased, and the case of *Fain v. Commonwealth,* 78 Ky. 183, is cited in support of the theory.

To excuse a person who takes the life of another upon the ground of self defense and apparent necessity he must have believed and

had rasonable grounds to believe that he was at the time in imminent danger of great bodily harm, or loss of life at the hands of the person slain and that he had no other apparently safe means of escape.

The law applies this rule to every person charged with the crime of murder who is of sound memory and discretion without regard to his peculiar temperament and disposition, and there is nothing in *Fain v. Commonwealth, supra,* at all inconsistent with this rule. There the defense was that the prisoner fired the fatal shots while partially or wholly unconscious under the false impression that he was being assaulted by the deceased. But here the excluded evidence did not conduce to prove that the intellectual faculties of the prisoner were either deranged or dormant at the time he took the life of Scanlon and consequently no legitimate purpose would have been accomplished by the introduction of it.

It is next contended that the court erred in giving and refusing instructions.

Whether the one given upon the hypothesis of murder was authorized by the evidence or not, inasmuch as he was found guilty of a lower degree of homicide we are not able to see how it prejudiced him.

We do not think as argued by counsel that "the jury was required by the second instruction to convict unless they found beyond a reasonable doubt that it was a case of actual self defense." The court did not undertake in that instruction to lay down fully and explicitly the law of self defense, but in a subsequent one it was correctly done, and if they considered all the instructions given, as we must presume the jury did do, they could not have been misled as to the law applicable to the case.

The following instruction was asked by appellant and refused: "If the jury believe from all the evidence that at the time of the killing the defendant believed and had reasonable grounds to belive that previous to the time of the killing the deceased, Patrick Scanlon, threatened to kill the defendant or do him great bodily harm that he had a right to consider the same in determining whether he was in danger of losing his life, or suffering great bodily harm at the hands of Scanlon whenever near, or with him, but the defendant had a right whenever he met the deceased if from such threats, if any, and the circumstances attending the meeting, or if

from the circumstances attending the meeting alone, he in good faith believed and had reasonable grounds to believe that he was then and there in danger of losing his life, or of suffering great bodily harm at the hands of the deceased, then he was not obliged to wait until he was actually assaulted, but he had the right to use such means as were at hand and as were necessary, or apparently necessary to protect himself from such immediate danger, and if in so doing he shot and killed the deceased he is excusable on the ground of self defense and should be acquitted."

A sufficient objection to this instruction is that it mentions and gives prominence to the collateral fact that the deceased had threatened appellant, whereby other facts that might have qualified or lessened the force of the threats proved, were kept out of view and made subordinate.

In this case it appears that while appellant was at the station, before leaving for his home as before mentioned, he met the deceased several times, and had conversations with him, yet it does not appear that there was any quarrel between them, or on the part of deceased any demonstration or threats of violence against appellant. But this fact, which ought to be considered in determining whether the threats made were intended by the deceased to be carried out was left out of view in the instruction quoted, and the jury might well have concluded that it was regarded of no importance by the court. As said in the case of *Coffman v. Commonwealth,* 10 Bush 495, "instructions ought as a general rule to be based only upon such facts as must be found by the jury in order to establish guilt, or to make out a defense."

By the instruction given by the court the jury were told to consider all the facts and circumstances proved in the case in determining upon their verdict and they were fully authorized and required to give such weight to the threats shown to have been made by the deceased as, considered in connection with all other facts proved, they were entitled to. We think therefore the instruction quoted was properly refused.

As the conduct of the Attorney for the Commonwealth now complained of was not objected to during the trial, as has been repeatedly held it can not be considered by this court.

Perceiving no error to the prejudice of the substantial rights of appellant we must *affirm* the judgment.

*Hallam & Myers, Carlisle, Goebel & Carlisle, for appellant.*
*P. W. Hardin, for appellee.*