STATE OF NORTH CAROLINA v. WILLIS TONY CADDELL

No. 40

(Filed 6 June 1975)

1. Criminal Law § 34— kidnapping case — evidence of beating and attempted rape

The trial court in a kidnapping prosecution did not err in permitting the victim to testify that, after her assailant took her from her home and stopped his car in an adjoining county, he beat and attempted to rape her, or in permitting attending physicians to testify as to the nature and extent of her injuries, since the acts of her assailant were all part of a continuous sequence and the purpose for which her assailant carried the victim from her home and the violence of the assaults upon her and the injuries inflicted thereby were relevant to the charge of kidnapping.

2. Criminal Law § 43— kidnapping — photographs of automobile, chisel and clothing

In a kidnapping prosecution wherein the victim testified her assailant beat and attempted to rape her, the trial court did not err in admitting for illustrative purposes photographs taken of the interior and exterior of the automobile in which the victim was abducted, a bloody chisel found therein and articles of the victim's clothing found in and about the automobile in the area where the beating and attempted rape occurred.

3. Criminal Law § 60— fingerprints — expertise of person lifting or taking prints

The trial court did not err in the admission of fingerprints lifted from an automobile vent glass and a set of defendant's fingerprints taken after his arrest by SBI agents into whose expertise in the lifting and taking of fingerprints defendant was not permitted to inquire prior to their testimony concerning their search for, lifting and taking of the prints, since a fingerprint which was, in fact, properly lifted or taken may be used by an expert for comparison regardless of the previous training and experience of the person who lifted or took it.

4. Criminal Law § 73— hearsay — cry for help — exclamation of passerby words of comfort

Testimony concerning a kidnapping and assault victim's cry to a passerby, "Please help me," his exclamation, "Oh, my God!" and words of comfort by the victim's father was not offered to prove the truth of the matters so stated and was not objectionable as hearsay.

5. Criminal Law § 89— statements to officer — corroboration

An officer's testimony concerning statements made to him by a kidnapping victim on the night of the offense was competent for the purpose of corroborating the victim's previous testimony.

6. Criminal Law § 89— corroborative testimony — discrepancy

The trial court did not err in admitting for corroborative purposes testimony that a kidnapping victim said, "Please help me; there is a

State v. Caddell

man going to kill me," when the victim had testified that she asked the witness for help and told him she was "being raped" since either version tended to show she was being assaulted by a man and was in need of assistance and the discrepancy was of no consequence.

7. **Criminal Law § 96— withdrawal of evidence — harmless error**

Error in permitting the State, over objection, to show by cross-examination of defendant that he was arrested eight times after he left North Carolina was harmless where the court almost immediately reversed its ruling and directed the jury to disregard the testimony.

8. **Criminal Law § 34— testimony as to arrest for another crime — harmless error**

Error in permitting an officer to give rebuttal testimony that defendant voluntarily told the officer that he had been arrested in St. Louis for larceny of an automobile after defendant had testified the arrest in St. Louis was for a traffic violation was harmless in the light of the record of defendant's former arrests, convictions, imprisonments and escapes introduced in evidence by defendant through a psychiatrist.

9. **Criminal Law §§ 63, 89— insanity.— rebuttal testimony — comparison of defendant's manner on witness stand and elsewhere**

Rebuttal testimony by an officer concerning the manner in which defendant talked and acted while he was bringing defendant back from another state as compared with defendant's manner on the witness stand, including testimony that during the trip defendant did not "roll his eyes or roll his head," was relevant and competent if defendant's performance on the witness stand afforded a basis for the belief that defendant was putting on a show in an effort to convey to the jury the impression that he was not sane; if not, the testimony was harmless error.

10. **Kidnapping § 2— sufficiency of evidence**

The State's evidence was sufficient for the jury in a kidnapping prosecution where it tended to show a seizure and carrying away and a substantial asportation of the victim by defendant with the intent to commit the felony of rape.

11. **Criminal Law § 114— instructions — no expression of opinion**

When the charge in this kidnapping prosecution is construed contextually and as a whole, the trial court did not express an opinion concerning the fact of the taking and carrying away of the victim in instructing the jury that defendant would not be guilty if defendant was completely unconscious of what transpired when the victim "was taken violently from her driveway at her residence, put in an automobile and held down by an arm, and, thereafter, was beat about the head and sexually molested."

12. **Criminal Law § 46— instructions on flight — no presumption of guilt**

Trial court's instruction on flight was proper without the inclusion of a statement that no presumption of guilt arises from evidence of flight.

**13. Criminal Law §§ 5, 112— insanity — burden of proof**

The trial court did not err in instructing the jury that defendant has the burden of proving the defense of insanity.

**14. Criminal Law §§ 5, 112— instructions on insanity**

The trial court did not err in instructing the jury that defendant was legally insane if he did not know the nature and quality of his act "or did not know that it was wrong" rather than instructing that defendant was insane if he did not know the nature and quality of his act or was "incapable of distinguishing between right and wrong in relation to such act" since both instructions are substantially the same.

**15. Criminal Law § 5; Homicide § 7.5— insanity — unconsciousness**

The defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind; as a consequence, the two defenses are not the same in effect, for a defendant found not guilty by reason of unconsciousness, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill.

**16. Criminal Law § 5; Homicide § 7.5— unconsciousness — affirmative defense — overruling of prior decision**

The holding in *State v. Mercer*, 275 N.C. 108, that "unconsciousness is never an affirmative defense" is overruled.

**17. Criminal Law § 5; Homicide § 7.5— unconsciousness — affirmative defense — burden of proof**

While unconsciousness, or automatism, is a complete defense to a criminal charge separate and apart from the defense of insanity, it is an affirmative defense, and the burden rests upon the defendant to establish this defense, unless it arises out of the State's evidence, to the satisfaction of the jury.

**18. Criminal Law § 112— instructions — unconsciousness — burden of proof — error favorable to defendant**

The trial court's instructions that unconsciousness is never an affirmative defense and that defendant has no burden to prove he was unconscious constituted error in defendant's favor and could not have prejudiced him in any way.

Chief Justice SHARP concurring in result and dissenting in part.

Justice COPELAND joins in the dissenting opinion.

APPEAL by defendant from *Robert Martin, S.J.*, at the 20 May 1974 Special Criminal Session of GUILFORD.

Upon an indictment, proper in form, the defendant was convicted of kidnapping Catherine Sutton and was sentenced to imprisonment for life. The indictment charges that the offense occurred 16 March 1971. The delay in the trial was due to the inability of the police officers to locate and arrest the defend-

State v. Caddell

ant, for whom a warrant was issued the day after the alleged offense, until he was located and taken into custody in Grand Rapids, Michigan, in October 1973.

The defendant entered pleas of not guilty and not guilty by reason of insanity. He was represented at his trial and upon appeal by the Public Defender of Guilford County. Contrary to the advice of his counsel, the defendant testified in his own behalf and, through his witness, Dr. Robert Rollins, Director of the Forensic Unit at Dorothea Dix Hospital, introduced in evidence the records of that hospital concerning his commitments thereto and the various diagnoses and reports made by its staff concerning his then mental condition.

The State's evidence was to the following effect:

At the time of the alleged offense, Catherine Sutton was fourteen years of age. She resided with her parents on Highway 62 in southern Guilford County, approximately one mile from the Randolph County line. Catherine then weighed about 105 pounds and was about five feet six inches tall.

At approximately 6:00 p.m., it still being daylight, her father left home in his automobile on an errand. As he drove away, Catherine walked down the driveway to the mail box, across the road and approximately 250 feet from the house. As she did so, she noticed an automobile proceeding along the highway following her father's car. She got the mail from the mail box and, as she recrossed the road, she noted that the other car turned around. She proceeded back up the driveway. When she had gone about one-third of the distance to the house, the automobile she had previously noticed stopped beside the mail box. The driver got out and raised the hood. Catherine called to ask if he had car trouble. The driver replied that he did and asked her to come to the car. She refused but told him she would go to her house and telephone for assistance. He asked if he might use the phone and she told him he could do so and resumed her walk up the driveway. She thereupon heard someone running behind her. The man seized her around the neck so that she could not scream or breathe, dragged her to the car and forced her into it, continuing to hold his arm around her neck so that she could not speak. Holding her down on the front seat with his elbow on her neck, he drove to a farm road and down it into a wooded area, in Randolph County, some three miles, by road, from the Sutton home.

State v. Caddell

After demanding that Catherine engage in an unnatural sexual act, which she refused to do, her captor choked her with his hands, then removed his own belt, put it around her neck and, running the tongue through the buckle, pulled it tight. Catherine was able to continue to get her breath only because she had put her hands between her neck and the belt. Her captor then pulled off her clothing, she resisting to the best of her ability with her hands. Taking a metal tool from the back seat of the car, he struck her about the head with it several times, lacerating the skin so that she bled profusely from these wounds. He then drove his fingers deeply into her private parts and, as she was still struggling, attempted to have sexual intercourse with her. He struck her in the face several times with his fist and she lost consciousness for a brief period. When she regained consciousness, he was still on top of her but she did not open her eyes, wishing him to think she was dead. He got out of the car and ordered her to do so. When she did not move, he pulled her out of the car and as she lay on the ground again attempted to have intercourse with her. He then got up and, after saying he would be back in a minute, ran away.

Catherine then heard another man (Mr. Whitt, owner of the farm to which she had thus been taken) call out. She called to him for help. Going to his house, she was given assistance and her father was called by telephone. She was taken to the hospital, examined and treated.

Catherine positively identified the defendant in court as the man who so seized her, forced her into his automobile, transported her to the wooded area and attacked her. Prior to such in-court identification, the court, on the motion of the defendant, conducted a voir dire in the absence of the jury. On this voir dire, Catherine testified that she saw her assailant's face before they reached the wooded area and during the above described struggle on the front seat of the automobile. About half an hour elapsed from her seizure in her driveway to the arrival of Mr. Whitt at the place where the defendant left her. Approximately 30 hours after the attack upon her, investigating police officers showed her a group of 13 photographs from which she selected a photograph of the defendant as that of her assailant and, thereafter, identified another photograph of him. At the end of the voir dire, the court found, as Catherine had testified, that her in-court identification of the defendant was based solely on what she saw at the time of the offense and did not result from any

pretrial identification procedures which were suggestive and conducive to mistaken identification and, therefore, such in-court identification of the defendant by her was admissible in evidence. The defendant does not attack this finding on appeal.

Catherine's testimony as to her discovery in the woods beside the abandoned car of her captor and her condition at that time was corroborated by the testimony of Mr. Whitt and Catherine's father. Dr. A. K. Maness, Jr., and Dr. Robert Phillips, physicians in Greensboro, who examined and treated Catherine in the emergency room of the hospital to which she was taken immediately after her rescue, testified that she had sustained multiple and severe lacerations of the scalp, bruises about the face and neck and deep penetration of the vaginal area, resulting in a great deal of bleeding and necessitating substantial suturing.

Investigating police officers testified to finding extensive blood stains throughout the interior of the automobile and upon a metal chisel and a brown leather belt found therein and introduced in evidence. Photographs of the exterior and interior of the automobile were identified by these officers and introduced in evidence, along with articles of Catherine's clothing found in or about the automobile by the officers and identified by her. Investigating officers also testified to their lifting of certain latent fingerprints, from the interior of the window glass on the driver's side of the automobile, and a print made upon the above mentioned chisel by a bloody palm. These the officers compared with the defendant's fingerprints and palm print, obtained following his arrest, and identified them as those of the defendant.

The defendant testified in his own behalf at considerable length. His direct testimony was an incoherent jumble of his contacts and controversies with other people in the morning and early afternoon of 16 March 1971, and his wanderings subsequent to that date. It had no relation to the alleged offense and did not purport to establish an alibi for the time thereof. Its apparent purpose was to convey the impression that he was and is mentally deranged and unable to remember any of his actions concerning Catherine Sutton. The only portion of his direct testimony remotely relating to the present charge against him was a denial that he had ever seen Catherine Sutton prior to the time when she took the witness stand and his statement: "I never did a degrading thing like this before. I have been

charged with nothing like this. I don't believe it. And if I did this, there is something wrong."

On cross-examination the defendant admitted that photographs of the automobile in which Catherine Sutton was carried away from her home and assaulted were pictures of his car. He further stated that he remembered nothing about the events of 16 March 1971 after he drove his car over an embankment at some time during the day prior to the attack on Catherine Sutton. He denied having taken any LSD pills or other drugs that day, except aspirin for a headache. The remainder of the cross-examination related to whether or not he made certain statements to the officer who brought him back to North Carolina from Michigan concerning his activities while absent from North Carolina, his seeing a police poster in Baltimore stating he was wanted in North Carolina for kidnapping and rape, his prior convictions, hospitalizations and self-inflicted wounds.

The defendant also called as his witness, contrary to the advice of his counsel, Dr. Robert Rollins, then Director of the Forensic Unit at Dorothea Dix Hospital in Raleigh and an expert psychiatrist. Through Dr. Rollins, the defendant introduced in evidence the contents of reports of the staff of Dorothea Dix Hospital of its findings and conclusions on eight separate commitments of the defendant to that institution. Seven of these were from January 1956 to May 1964, the last being a commitment for examination in connection with the present charge.

These reports of the hospital staff show that his first commitment to the hospital was pursuant to an order of the Superior Court of Durham County on 12 January 1956, which order stated that the defendant had been found incapable of pleading to bills of indictment then pending against him by reason of insanity and ordered that he be confined in the hospital until such time as the hospital authorities found he had regained his sanity and was capable of standing trial. The several reports of the hospital staff state:

In 1956, 1962 and 1963, the defendant received electric shock treatments at the hospital. On 10 February 1956, the staff diagnosis of the defendant was "psychotic depressive reaction in an individual with an anti-social personality" and it was the opinion of the staff that he had recovered from his psychosis and was no longer mentally disordered. This report shows that

State v. Caddell

the defendant was then under a prison sentence in Ohio, in addition to the criminal charge against him in Durham County. The admitting physician on that occasion stated in the hospital record that his "impression" was that the defendant was then suffering from "acute schizophrenic process." The defendant was returned to the Superior Court of Durham County for trial and was there convicted of larceny and given consecutive sentences totaling 40 years.

In 1974, in connection with the present charge, Dr. Rollins, himself, examined the defendant to determine his competency to stand trial. His diagnosis was: "One, that he was without psychosis; that is, he was not insane, and, two, he had a social personality disorder," which "some people" would interpret as meaning that the defendant was "just mean." His report of that examination included the following:

"Since the age of 15 the client has spent most of his time in some type of state institution, either a correctional facility or a psychiatric hospital. His admissions to Dorothea Dix Hospital began in 1956 when he was transferred from Central Prison. He's had at least seven admissions to Dorothea Dix Hospital and has received diagnoses including sociopathic personality disturbance, antisocial reaction, and psychotic depressive reaction. Many of his admissions to this hospital have been either by criminal court order or as a transfer from Central Prison. He has also been treated in the State Hospital in Ohio where he was admitted at least three times and was diagnosed sociopathic personality, antisocial reaction. At Spring Grove Hospital in Maryland, he was diagnosed schizophrenic reaction, paranoid type. The client has a history of escapes from this and other hospitals as well as escapes from correctional facilities. His hospitalizations at Dorothea Dix Hospital have usually been characterized by hostile, belligerent and manipulative behavior and resulting in the client becoming involved in fights with other residents. * * * It might be noted that the client has a history of mutilating himself in order to manipulate his environment. * * * It was a consensus of the group [of staff members examining the defendant], in spite of the client's somewhat limited manner of expressing himself, that he was competent to stand trial at the present time. * * * It was learned that the client has allegedly been arrested in several states for traffic violations and

in at least one state for burglary. * * * [I]t is the opinion of the medical staff that Mr. Caddell is competent to plead to charges of kidnapping and rape. * * * PSYCHIATRIC DIAGNOSIS: Without psychosis, not insane. Sociopathic personality disorder."

Hospital records of other commitments of this defendant show that on these occasions he was returned by the hospital to Central Prison, having been found "normal as to any kind of brain disease at that time" and having been diagnosed as "sociopathic personality disturbance, anti-social reaction."

On these occasions the records show that the staff found the defendant was not insane. When in the hospital he was "a severe management problem," requiring continuous surveillance to prevent escape.

The hospital report of the defendant's commitment to it, on 4 February 1964, states:

"His family hired a number of lawyers who succeeded in obtaining his release from prison in the fall of 1963. * * * He says that on Thanksgiving Day he had dinner with his family and was moving into new quarters which he had rented near to his job. A man whom he had known in prison persuaded him to drive off in a car and they went to a grill and then to the house where the patient had rented a room. The man rented a room in the same house, went to sleep, and ultimately vanished completely. The patient drove the man's car and was charged with having stolen it when it turned out to be a stolen car."

On that occasion the hospital staff diagnosis was, "without psychosis (Not Insane) * * * Willis Caddell does know the difference between right and wrong." The staff having concluded that he was then not insane, he was sent back to the Superior Court of Guilford County for trial on the charge of larceny of the automobile.

In response to a question as to what he meant by the term "manipulating one's environment," Dr. Rollins testified, "I believe Mr. Caddell, on occasion, seeks to either present himself as mentally not responsible or to blame other people for his problems, in order to escape the consequences of his behavior."

He further testified that he had diagnosed the defendant's condition as "sociopathic personality and anti-social reaction"

and that characteristics of that condition are "meanness toward other human beings," "an inability to get along with people," "an inability to abide by the rules of society," and, in the case of Mr. Caddell, "extreme aggressiveness toward other human beings."

At the time of the defendant's commitment to Dorothea Dix Hospital in connection with the present charge, Dr. Rollins was unable to carry out the order of the court to determine whether the defendant was able to distinguish right from wrong on 15 March 1971, and made no such determination.

In rebuttal, the State called as its only witness, Agent Marshall of the State Bureau of Investigation, the officer who, in 1973, returned the defendant to North Carolina from Michigan for trial in the present case. Agent Marshall testified that on the entire trip (by automobile) the defendant talked lucidly and "completely different" from the manner in which he talked on the witness stand. On that trip from Michigan to North Carolina, "He did not roll his eyes or roll his head." He then told Agent Marshall that he had been arrested in St. Louis in connection with larceny of an automobile, that the St. Louis Police Department discovered he was wanted in North Carolina and that he had a "mental history," so they committed him to a mental hospital in St. Louis for observation pending his extradition to North Carolina and that he escaped from that hospital. He also told Agent Marshall that, while in Baltimore, he went to the Police Department to obtain a permit to carry a gun so that he could be a security guard and, while having his fingerprints taken for that purpose, saw on the bulletin board a poster stating that he was wanted in North Carolina for kidnapping and rape. He was picked up for return to North Carolina in Grand Rapids, Michigan. All these statements by the defendant to Officer Marshall were "volunteered statements."

*Rufus L. Edmisten, Attorney General, and Alan S. Hirsch, Associate Attorney, for the State.*

*Wallace C. Harrelson, Public Defender, for defendant.*

LAKE, Justice.

We find no merit in the defendant's several assignments of error relating to the admission of evidence.

[1] The defendant contends that, upon his trial in Guilford County, on the charge of kidnapping therein, it was error, over

his objection, to permit Miss Sutton to testify that, after the car stopped in the wooded area in Randolph County, her assailant beat and attempted to rape her and to permit attending physicians to testify as to the nature and extent of her injuries. The acts of her assailant, to which Miss Sutton so testified, were all parts of a continuous sequence, consuming in its entirety approximately 20 minutes and occurring within a total distance of not over three miles. It is perfectly apparent that the abuse of Miss Sutton for the gratification of her assailant's sexual desires was the purpose of his seizing her and forcibly carrying her from her home to the wooded area.

It is well established that, as a general rule, in a prosecution for a particular crime, the State cannot introduce, as part of its case in chief, evidence tending to show that the accused has committed another distinct, independent, or separate offense, but it is equally well established that this rule does not apply when the two crimes are parts of the same transaction and, by reason thereof, are so connected in time or circumstance that one cannot be fully shown without proving the other. *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364. The State, having introduced evidence of the bare bones of the offense charged in the indictment (kidnapping), is not precluded thereby from showing the entire transaction. Evidence of facts relevant to the crime charged is not inadmissible merely because it also shows the defendant to have been guilty of an additional crime. *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423; Stansbury, North Carolina Evidence, Brandis Revision, §§ 91, 92. The purpose for which her assailant carried Miss Sutton from her home is obviously relevant to the charge of kidnapping. The violence of the assaults upon her and the injuries inflicted thereby are also relevant thereto. The separation of the State into counties has a bearing upon the venue for the trial of criminal offenses, but not upon the relevancy of evidence.

[2] For the same reason, there was no error in permitting the State to introduce in evidence photographs taken of the interior and exterior of the automobile in which Miss Sutton was abducted, the bloody chisel and belt found therein and articles of Miss Sutton's clothing found in and about the automobile in the wooded area to which she was taken and where the beating and the attempted rape occurred. The jury was properly instructed that the photographs were admitted for the purpose of illustrating the testimony of the witness by whom they were identified and not as substantive evidence.

[3]　There was no error in admitting into evidence finger-prints lifted from the interior of the vent glass on the driver's side of the automobile and the set of the defendant's finger-prints taken after his arrest. The contention of the defendant is that these prints were lifted and taken by agents of the State Bureau of Investigation, into whose expertise in the lifting and taking of fingerprints he was not permitted to inquire prior to their testimony concerning their search for, lifting and taking of the prints. Neither of these witnesses was asked to express any opinion concerning these matters. Each testified as to what he, himself, did. The defendant had full opportunity to cross-examine each of the witnesses, following his direct testimony, concerning the methods used in lifting and taking the prints. He did not do so.

The subsequent witness, who compared the fingerprints in question and identified a print taken from the car vent glass as that of the defendant, and who, himself, lifted the bloodied palm print from the chisel used in the beating of Miss Sutton and identified it as the palm print of the defendant, was stip-ulated by the defendant to be an expert in the field of finger-print examination and identification. There was no objection by the defendant to the admission in evidence of this far more damaging print taken from the chisel. Obviously, some expertise is desirable in the lifting and taking of fingerprints, in order to assure usable prints, but a fingerprint, which was, in fact, properly lifted or taken, may be used by an expert for compari-son, regardless of the previous training and experience of the person who lifted or took it. We do not perceive how an in-expertly lifted fingerprint could be transformed by that process into the fingerprint of a person who did not make it.

[4]　The defendant next contends that the court violated the hearsay rule in admitting into evidence certain out-of-court statements. In the first place, some of these statements are not hearsay at all. The cry of the badly battered girl to Mr. Whitt, "Please help me," his exclamation, "Oh, my God!" upon his discovery of her and Mr. Sutton's words of comfort to his stricken daughter, when he came to her in the Whitt home, could not, by any stretch of the imagination, be deemed to have been offered to prove the truth of the matters so stated. Thus, they are not objectionable as hearsay. *State v. Crump,* 277 N.C. 573, 585, 178 S.E. 2d 366; *State v. Griffis,* 25 N.C. 504; Stansbury, North Carolina Evidence, Brandis Revision, § 141.

[5, 6]  Testimony of Officer Marshall concerning statements made to him by Miss Sutton on the night of the offense were admitted for the purpose of corroborating her previous testimony and the jury was so instructed. It was competent for that purpose. Likewise, it was not error to refuse to strike Mr. Whitt's testimony that when he discovered Miss Sutton in the woods she said, "Please help me; there is a man going to kill me," her prior testimony having been that she asked Mr. Whitt for help and told him she was "being raped." In this connection, the discrepancy is of no consequence. Either version tended to show she was being feloniously assaulted by a man and was in need of assistance. To be admissible for corroborative purposes it is not necessary that the prior statement of a witness be in the exact words of her testimony at the trial, it being sufficient that the two are consistent. See, Stansbury, North Carolina Evidence, Brandis Revision, § 52.

[7, 8]  Technically, it was error to permit the State, over objection, to show by cross-examination of the defendant that he was arrested eight times after he left North Carolina. *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174. However, the court, almost immediately, reversed its ruling and directed the jury to dismiss that matter from their minds as if they had never heard it. It was also technical error to permit Officer Marshall, called as a witness for the State in rebuttal, to testify that the defendant, while Officer Marshall was bringing him from Michigan to North Carolina, voluntarily told the officer that he, the defendant, had been arrested in St. Louis in connection with larceny of an automobile, the defendant, on direct examination, having testified that the arrest in St. Louis was for a traffic violation. However, in view of the record of the defendant's former arrests, convictions, imprisonments and escapes introduced in evidence by the defendant, himself, through Dr. Rollins, it is inconceivable that this testimony by Officer Marshall contributed, to any appreciable degree, to the defendant's conviction in this case. It must be deemed harmless error. These technical errors do not afford any basis for the granting of a new trial.

[9]  Over objection, Officer Marshall testified, in rebuttal, concerning the manner in which the defendant talked and acted on their trip together from Michigan to North Carolina, as compared with his manner on the witness stand, testifying specifically that, en route. from Michigan, he did not "roll his

State v. Caddell

eyes or roll his head." Dr. Rollins, the defendant's witness, had previously testified that the defendant "on occasion seeks to * * * present himself as mentally not responsible * * * in order to escape the consequences of his behavior." A reasonable inference from the question of the prosecuting attorney to Officer Marshall is that, while the defendant was testifying, he rolled his eyes and head in such a manner as to cause the District Attorney to believe that he was putting on a show in an effort to convey to the jury the impression that he was not sane. The trial judge was, of course, in a position to know whether the defendant's performance on the witness stand afforded basis for such belief. If so, the testimony of Officer Marshall in this connection was relevant and competent. If not, it would not be relevant but would seem, beyond question, to be harmless. We note that Officer Marshall did not express any opinion concerning the defendant's sanity while he and the defendant traveled together. He merely stated facts observed by him, from which facts the jury could draw its own conclusion as to the defendant's performance on the witness stand.

[10] . Clearly, there was no error in the denial of the defendant's motion for judgment of nonsuit. Considering the . State's evidence in the light most favorable to the State, as must be done upon such a motion, Strong, N. C. Index 2d, Criminal Law, § 104, it is abundantly sufficient to. support findings that the offense of kidnapping was committed and that the defendant was the perpetrator of it. This being true, the motion for judgment of nonsuit was properly denied. *State v. Roseman.* 279 N.C. 573, 184 S.E. 2d 289; *State v. Bass.* 253 N.C. 318. 116 S.E. 2d 772. As Justice Sharp, now Chief Justice, said in *State v. Dix,* 282 N.C. 490, 193 S.E. 2d 897, "In our decisions, *kidnapping* is defined generally as the unlawful taking and carrying away of a human being against his will by force, threats, or fraud." It was there held that there must be a substantial asportation of the victim. It is unnecessary in the disposition of this assignment of error to determine whether the unlawful taking and carrying away of the victim must be with a felonious intent. Here. the evidence for the State, taken to be true, clearly shows both a substantial asportation and a seizure and carrying away with the intent to commit the felony of rape.

[11] The defendant next contends that, in violation of G.S. 1-180, the court expressed an opinion concerning the fact of the taking and carrying away of Miss Sutton in the following

excerpt from the court's instruction upon the defense of unconsciousness, which defense we discuss below:

"Now, members of the jury, as I have told you, the defendant contends that he was unconscious at the time that Catherine Sutton was taken from the driveway of her residence and put in an automobile and then taken to a point two and a half miles away to an old sawmill road in Randolph County. * * * If you find that the defendant was completely unconscious of what transpired *when Catherine Sutton was taken violently from her driveway at her residence, put in an automobile and held down by an arm, and, thereafter, was beat about the head and sexually molested* * * * then he would not be guilty, and it would be your duty to so find." (Emphasis added.)

The court, in its charge, had previously told the jury that the State must prove the defendant is guilty beyond a reasonable doubt, correctly defining that term, and had further stated: "The Court expresses no opinion or intimations of opinion as to what the facts are. That is for you to determine. You determine what the facts are from your consideration of the evidence in the case * * * What any of the evidence does show, if anything, is exclusively a matter that you pass upon.

Almost immediately after the statement of which the defendant complains, the court, in concluding its charge, instructed the jury that if the jury found "from the evidence beyond a reasonable doubt" that the defendant "wilfully and intentionally took Catherine Sutton and carried her from her residence, the driveway of her residence in Guilford County to a point on an old sawmill road some two and a half miles away in Randolph County, against her will, by taking her forcibly from the driveway of her home, placing her in an automobile and taking her in the automobile to the place in Randolph County on an old sawmill road, and without lawful authority, and this constituted a substantial carrying away, it would be your duty to return a verdict of guilty of kidnapping," but if the jury did not so find, or had a reasonable doubt as to any one or more of those things, it would be the duty of the jury to return a verdict of not guilty.

It is well established that in determining whether there is error in the court's charge to the jury requiring a new trial, the charge must be construed contextually and as a whole. Strong, N. C. Index 2d, Criminal Law, § 168. So construed, we

find no basis for a new trial in the above quoted portion of the court's instruction concerning the defense of unconsciousness.

[12] The defendant assigns as error the following portion of the charge:

"Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient, in itself, to establish defendant's guilt."

The defendant asserts that the court erred in failing to add to this instruction a statement that no presumption of guilt arises from evidence of flight. It is true that flight of the defendant does not give rise to a presumption of his guilt of the offense charged. *State v. Gaines,* 260 N.C. 228, 132 S.E. 2d 485; Stansbury, North Carolina Evidence, Brandis Revision. § 178. However, it is not necessary so to instruct the jury and the above quoted instructions by the trial judge was free from error.

[13] The defendant assigns as error the following instruction concerning the burden of proof with reference to the defense of insanity:

"The defendant has the burden of proving that he was insane. However, unlike the State, which must prove the defendant's guilt beyond a reasonable doubt, the defendant need only prove his insanity to your satisfaction."

As the defendant concedes in his brief, this instruction is in accord with numerous decisions of this Court. *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305, decided 14 April 1975; *State v. Atkinson,* 275 N.C. 288, 314, 167 S.E. 2d 241, reversed as to death penalty only, 403 U.S. 948; *State v. Harris,* 223 N.C. 697, 28 S.E. 2d 232; *State v. Creech,* 229 N.C. 662, 51 S.E. 2d 348; *State v. Swink,* 229 N.C. 123, 47 S.E. 2d 852; and many others. In the Swink case, Justice Ervin, speaking for this Court, said:

"Since soundness of mind is the natural and normal condition of men, everyone is presumed to be sane until the contrary is made to appear. This presumption of sanity applies to persons charged with crimes, but it is rebuttable. (Citations omitted.) These considerations give rise to the

firmly established rule that the burden of proof upon a plea of insanity in a criminal case rests upon the accused who sets it up. But he is not obliged to establish such plea beyond a reasonable doubt. He is merely required to prove his insanity to the satisfaction of the jury."

In *State v. Creech, supra,* speaking through Chief Justice Stacy, this Court said:

"It is the law of this jurisdiction that an affirmative defense, *e.g.,* drunkenness or insanity, which partakes of the nature of a plea of confession and avoidance, is to be satisfactorily proved by the defendant unless it arises out of the evidence produced against him. (Citations omitted.) The *onus* of showing 'justification, excuse or mitigation,' to the satisfaction of the jury, is on the defendant. (Citations omitted.) * * * The presumption that the accused was sane and responsible for his acts persists until the contrary is shown to the satisfaction of the jury. Therefore, if the jury are left in doubt as to the sanity or responsibility of the accused, the presumption prevails."

The defendant contends that the long line of decisions of this Court so stating the rule as to the burden of proof of insanity should be overruled. This we decline to do.

**[14]** As to what constitutes insanity as a defense to a criminal charge, the court instructed the jury:

"The defendant was insane if, at the time of the alleged crime and as a result of mental disease or defect, he either did not know the nature and quality of his act *or did not know that it was wrong."* (Emphasis added.)

The defendant contends that this instruction places upon the defendant a greater burden than is imposed upon him by a test of insanity as stated in *State v. Swink, supra,* where this Court said:

"It is a well-settled rule in the administration of criminal justice in this State that an accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he

is doing, or, if he does know this, *incapable of distinguishing between right and wrong in relation to such act.*" (Emphasis added.)

We perceive no substantial differences between the italicized portion of the instruction given by the trial judge and the italicized portion of the rule stated in *State v. Swink, supra,* insofar as the nature of the burden placed upon the defendant is concerned. In fact, the language so used by the trial judge is precisely that used by Lord Chief Justice Tindall in McNaghten's case, 8 Eng. Rep. 718 (1843), from which the law of this State with reference to the test of insanity as a defense to a criminal charge derives. In *State v. Harris, supra,* Chief Justice Stacy, speaking for the Court, uses the two expressions interchangeably, saying:

> "The test of responsibility is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation. * * * [I]f 'the accused should be in such a state of mental disease as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong,' the law does not hold him accountable for his acts. * * * "

Furthermore, in *State v. Swink, supra,* after stating the test as above quoted, Justice Ervin said, "The trial judge charged the jury, in substance, that to establish the prisoner's plea of insanity it must be 'clearly established' that he did 'not know the nature and quality of the act he was doing, or if he did know it, that *he did not know he was doing what was wrong'.*" (Emphasis added.)

The court said that it was error to charge that a plea of insanity must be "clearly established" but said nothing about the remainder of the charge. We find no merit in this assignment of error.

We come now to the defendant's contention that the trial court erred in its instruction with reference to the burden of proof in connection with the defense of unconsciousness. That instruction was:

> "Now, members of the jury, a person cannot be held criminally responsible for acts committed while he is unconscious. Unconsciousness is never an affirmative defense. Where a person commits an act without being conscious

thereof, such an act is not criminal even though if committed by a person who was conscious it would be a crime. The defendant has no burden to prove that he was unconscious. If you find that the defendant was completely unconscious of what transpired when Catherine Sutton was taken violently from her driveway at her residence * * * then he would not be guilty, and it would be your duty to so find."

The defendant contends that the instruction that the defendant does not have the burden of proof on this issue and the instruction that the jury would find him not guilty, if it found he was "completely unconscious of what transpired" at the time of the alleged offense, are inconsistent and the court should have charged the jury to find the defendant not guilty unless they found beyond a reasonable doubt that he was conscious of what allegedly transpired.

This assignment of error has merit if, but only if, under the law of this State, a criminal defendant relying upon the defense of unconsciousness, also called automatism, does not have the burden of proof thereof. If the burden of proof is upon the defendant on this issue, the error in the charge was favorable to the defendant and does not entitle him to a new trial.

The defense of unconsciousness, or automatism, while not an entirely new development in the criminal law, has been discussed in relatively few decisions by American appellate courts, most of these being in California where the defense is expressly provided by statute. In *Bratty v. Attorney General for Northern Ireland,* All E. R. 3 (1961) 523, Lord Denning observed: "Until recently there was hardly any reference in the English books to this so-called defense of automatism. There was a passing reference to it in 1951 in *R. v. Harrison-Owen* [1951] 2 All E. R. 726." The only express reference to it which we have found in our Reports is in *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328, which we discuss below.

Unconsciousness, as a defense to a criminal charge, is discussed briefly in most of the textbooks and treatises on criminal law, the most extensive treatment of it, which has come to our attention, being in LaFave and Scott, Criminal Law, § 44 (1972), where it is said, "[a] defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would

otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness." In *State v. Mercer, supra,* at p. 119, this Court said: "Upon the present record, defendant was entitled to an instruction to the effect the jury should return verdicts of not guilty if in fact the defendant was *completely* unconscious of what transpired when [the victims] were shot." See also: 21 AM. JUR. 2d, Criminal Law, § 29; 22 C.J.S., Criminal Law, § 55; Burdick, Law of Crime, §§ 216, 217 (1946); Brill, Cyclopedia of Criminal Law, §§ 124, 128 (1922); Bishop, Criminal Law, §§ 388, 395 (9th ed. 1923); Wharton, Criminal Law and Procedure, § 50 (Anderson's Edition 1957); Weihofen, Mental Disorder as a Criminal Defense, pp. 121-122 (1958); Miller, Criminal Law, § 39 (1934).

[15] The defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind. As a consequence, the two defenses are not the same in effect, for a defendant found not guilty by reason of unconsciousness, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill.

The California Penal Code, § 26(5), provides: "All persons are capable of committing crimes except those belonging to the following classes: * * * Three. Lunatics and insane persons. * * * Five. Persons who committed the act charged without being conscious thereof. * * * " The Oklahoma statute is identical. Thus, the courts of these states have, quite correctly, held that the defenses of insanity and unconsciousness are not the same. *People v. Hardy,* 33 Cal. 2d 52, 198 P. 2d 865; *People v. Methever,* 132 Cal. 326, 64 P. 481; *Carter v. State* (Okla. Ct.), 376 P. 2d 351. Similar legislation is in effect in Arizona, Idaho, Montana, Nevada, South Dakota and Utah. See, LaFave and Scott, supra, at n. 7.

Sources of unconsciousness, recognized as a defense by courts and textwriters, include somnambulism *(Fain v. The Commonwealth,* 78 Ky. 183), somnolenture, hypnotism (see, *People v. Worthington,* 105 Cal. 166, 38 P. 689), cerebral concussion, delirium from fever or drugs, diabetic shock *(Corder v. Commonwealth [Ky.],* 278 S.W. 2d 77); epileptic black-outs *(Smith v. Commonwealth [Ky.],* 268 S.W. 2d 937; *People v. Magnus,* 92 Misc. 80, 155 N.Y.S. 1013), and drunkenness. Unconsciousness due to voluntary drunkenness was held no defense in *Lewis v. State,* 196 Ga. 755, 27 S.E. 2d 659.

It is generally said that amnesia, in and of itself, is not a defense to a criminal charge. *Thomas v. State,* 201 Tenn. 645, 301 S.W. 2d 358; *Bratty v. Attorney General for Northern Ireland, supra* (Lord Denning's opinion); Miller, Criminal Law, § 39(a) (1934); 21 AM. JUR. 2d, Criminal Law, § 30; 22 C.J.S., Criminal Law, § 55. In *Thomas v. State, supra,* the Supreme Court of Tennessee quoted Gray, Attorneys' Textbook of Medicine, § 96.01 (3rd ed. 1949), as follows:

> "Amnesia, loss of memory, may lead to crimes entirely unknown to the culprit at a later date. That is rare. More frequently, the accused, remembering full well what he has done, alleges amnesia in false defense. He is a malingerer. To prove his innocence or guilt may be most difficult. * * * Failure to remember later, when accused, is in itself no proof of the mental condition when crime was performed."

The principal point of difference among the few reported decisions on the defense of unconsciousness is with reference to the burden of proof. In *People v. Hardy, supra,* the California Supreme Court said:

> "In *People v. Nihell,* 144 Cal. 200, 77 P. 916, where defendant claimed he was unconscious by reason of epilepsy, it was held that the burden was on him to establish the peculiar mental condition upon which he relied, and the Court stated * * * 'Men are presumed to be conscious when they act as if they were conscious, and if they would have the jury know that things are not what they seem, they must impart that knowledge by affirmative proof.' This is merely another way of saying that defendant has the duty of going forward with the evidence, and it is entirely consistent with the rule that defendant has only the burden of producing evidence which would raise a reasonable doubt in the minds of the jury."

In *Bratty v. Attorney General for Northern Ireland, supra,* the accused killed a girl, a passenger in his car, by strangling her with her own stocking. He testified that a "blackness" came over him and that "I didn't know what I was doing; I didn't realize anything," and that he had previously had "feelings of blackness and headaches." There was medical testimony that he *might have been* suffering from an attack of psychomotor epilepsy, a disease of the mind which could cause ignorance of

the nature and quality of acts done. There was no medical evidence of any other pathological cause for a state of automatism. The trial judge refused to submit the defense of automatism to the jury but did submit the defense of insanity, which the jury rejected. The House of Lords held: "The trial judge was justified in not putting the defense of automatism to the jury since the evidence attributed any involuntariness in the appellant's act solely to a disease of the mind and there was no sufficient evidence of automatism, apart from insanity, to be left to the jury." The Lord Chancellor (Viscount Kilmuir) said:

"It is necessary that a proper foundation be laid before a judge can leave 'automatism' to the jury. That foundation, in my view, is not forthcoming merely from unaccepted evidence of a defect of reason from disease of the mind.

\* \* \*

"[In *Hill v. Baxter* [1958] 1 All E. R. 193 [1958] 1 Q.B. 277] Lord Goddard expressed the view that the onus of proving the defendant was in a state of automatism was on him because automatism is akin to insanity and further is a fact exclusively within his own knowledge. The other members of the court reserved this point.

\* \* \*

" (If one subtracts the medical evidence directed to the establishment of psychomotor epilepsy, I am of the opinion that there was not any evidence on which a jury could properly have considered the existence of automatism. Counsel for the appellant directed our attention to the appellant's statement, to his evidence and to his previous conduct. In my view they do not provide evidence fit to be left to a jury on that question. They could not form the basis of reasonable doubt.

\* \* \*

"[N]ormally, the presumption of mental capacity is sufficient to prove that he acted consciously and voluntarily and the prosecution need go no further. But, if, after considering evidence properly left to them by the judge, the jury are left in real doubt whether or not the accused acted in a state of automatism, it seems to me that on principle they should acquit because the necessary mens rea—if indeed the actus reus—has not been proved beyond a reasonable doubt."

Lord Denning was of the opinion that while the ultimate burden rests on the prosecution to prove every element essential in the crime, it was entitled to rely on the presumption that every man has sufficient mental capacity to be responsible for his crimes. He said:

> "[I]f the defence wish to displace that presumption they must give some evidence from which the contrary may reasonably be inferred. * * * The necessity of laying this proper foundation is on the defence: and if it is not so laid, the defence of automatism need not be left to the jury * * * . The evidence of the man himself will rarely be sufficient unless it is supported by medical evidence which points to the cause of the mental incapacity. It is not sufficient for a man to say 'I had a black-out:' for 'black-out' as Stable, J., said in *Cooper v. McKenna* [1960] Qd. R. at p. 419, 'is one of the first refuges of a guilty conscience and a popular excuse.' The words of Devlin, J., in *Hill v. Baxter* [1958], 1 All E.R. at p. 197 [1958], 1 Q.B. at p. 285, should be remembered:

> 'I do not doubt that there are genuine cases of automatism and the like, but I do not see how the layman can safely attempt without the help of some medical or scientific evidence to distinguish the genuine from the fraudulent.' "

Although unconsciousness, or automatism, is a defense separate and apart from insanity, in that it may not be the result of a disease or defect of the mind, it does not necessarily follow that the two defenses are different in law with respect to the burden of proof. Somnambulism and epilepsy, two sources of the defense of unconsciousness, have been said to be like unto insanity. See: *Tibbs v. Commonwealth,* 138 Ky. 558, 128 S.W. 871; *Zimmerman v. State,* 85 Tex. R. 6, 215 S.W. 101; *Oborn v. State,* 143 Wis. 249, 126 N.W. 737; 21 Am. Jur. 2d, Criminal Law, § 29, note 6; 22 C.J.S., Criminal Law, § 64; Burdick, Law of Crime, § 216 (1946); Brill, Cyclopedia of Criminal Law, § 127 (1922); Bishop, Criminal Law, § 395 (9th Ed. 1923); LaFave and Scott, Criminal Law, § 44 (1922); Miller, Criminal Law, § 39(a) (1934); Wharton, Criminal Law and Procedure, § 50 (Anderson's Ed. 1957).

In *State v. Davis,* 214 N.C. 787, 1 S.E. 2d 104, Justice Barnhill, later Chief Justice, speaking for this Court, said:

> "[I]t has long been settled in this State that although the burden of establishing the *corpus delicti* is upon the

State, when defendant relies upon some, independent, distinct, substantive matter of exemption, immunity or defense, beyond the essentials of the legal definition of the offense itself, the *onus* of proof as to such matter is upon the defendant."

This rule was quoted as the ground for decision in *State v. Brown,* 250 N.C. 209, 108 S.E. 2d 233, and *State v. Johnson,* 229 N.C. 701, 51 S.E. 2d 186. It has been applied to the following defenses, denominated "affirmative" defenses: *Drunkenness. State v. Arnold,* 264 N.C. 348, 141 S.E. 2d 473; *State v. Hairston,* 222 N.C. 455, 23 S.E. 2d 885; *State v. Cureton,* 218 N.C. 491, 11 S.E. 2d 469; *State v. Creech, supra. Self Defense* and *Mitigation. State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461. *Insanity. State v. Creech, supra; State v. Hairston, supra;* In *State v. Arnold,* 35 N.C. 184, Chief Justice Ruffin, speaking for the Court, said the burden was upon the defendant, charged with murder, to prove he was under the age of 14, and so without legal capacity to commit the crime.

An affirmative defense is one in which the defendant says, "I did the act charged in the indictment, but I should not be found guilty of the crime charged because * * * . " In *Bratty v. Attorney General for Northern Ireland, supra,* the House of Lords, and in *People v. Hardy, supra,* the California Court, were of the opinion that, once the defendant has introduced substantial evidence of unconsciousness, or automatism, the ultimate burden of proving consciousness, beyond a reasonable doubt, rests upon the prosecution, because an element of crime is the presence of *mens rea* at the time the act was done. The defense of insanity is said to be distinguishable because the law presumes sanity. We are unable to perceive a reasonable basis for distinction, in this respect, between *insanity* and *intoxication* on the one hand and *unconsciousness* from a different cause, on the other. In all three defenses the contention is the same— the defendant did the act, but should not be convicted because the requisite mental element was not present. The same presumption, which casts upon the defendant, claiming insanity, the burden of proving it to the satisfaction of the jury, and thus to negative the presence of *mens rea,* applies also to the defendant who asserts a temporary mental lapse due to concussion, somnolentia, epilepsy or the like.

In *State v. Mercer, supra,* the defendant, according to the State's evidence, went to the home of his estranged wife, armed

with a pistol. When she refused to admit him, upon his knock-
ing at the locked door, he kicked the door open, entered and
immediately shot and killed his wife, her woman companion
and the infant son of the other woman. His testimony was that
he became "blank in his mind" when his wife ordered him off
the porch and "when he became conscious, he was standing on
the porch and the pistol, which was beside his head clicked."
There was no medical, or other, evidence establishing any path-
ological explanation of the alleged "black-out." This Court, say-
ing there was no evidence of insanity, held, as one of several
grounds for a new trial, that the trial court's charge to the
jury was deficient in that it limited the jury's consideration of
the alleged unconsciousness to its bearing upon the matter of
premeditation and deliberation. We said, "Unconsciousness is
never an affirmative defense."

[16] Upon further reflection, we are convinced that we erred
in *State v. Mercer, supra,* in saying, "Unconsciousness is never
an affirmative defense." In that respect, *State v. Mercer, supra,*
is hereby overruled.

Our research has disclosed no decision, other than *State v.
Mercer, supra,* in which any court has held that the defendant's
uncorroborated and unexplained testimony that, at the moment
of his otherwise criminal act, he "blacked-out," and so does not
remember what, if anything, he did, is sufficient to carry to
the jury the question of unconsciousness as a defense. As
above noted, the House of Lords has declared the law of England
to be otherwise. *Bratty v. Attorney General for Northern Ire-
land, supra.* We need not presently determine whether, in that
respect, *State v. Mercer, supra,* correctly applied the law of
North Carolina.

[17] We now hold that, under the law of this State, uncon-
sciousness, or automatism, is a complete defense to a criminal
charge, separate and apart from the defense of insanity; that
it is an affirmative defense; and that the burden rests upon the
defendant to establish this defense, unless it arises out of the
State's own evidence, to the satisfaction of the jury.

[18] In the present case, the learned trial judge fell into error,
in his instruction as to the burden of proof on the question of
unconsciousness, by reason of our own error in *State v. Mercer,
supra,* but his error therein was in the defendant's favor and

State v. Caddell

could not have prejudiced him in any way. It does not, therefore, afford a basis for granting him a new trial.

Numerous other assignments of error set forth in the defendant's case on appeal are purely formal or, not having been brought forward in his brief, are deemed abandoned. Rule 28, Rules of Practice in the Supreme Court; *State v. Felton,* 283 N.C. 368, 196 S.E. 2d 239; Strong, N. C. Index 2d, Criminal Law, § 166.

· No error.

Chief Justice SHARP, concurring in result and dissenting in part.

I am in accord with the decision that no prejudicial error was committed in defendant's trial below and that his conviction should be affirmed. I do not agree, however, that in order to reach this proper result it is necessary to repudiate our unanimous holding in *State v. Mercer,* 275 N.C. 108, 117, 165 S.E. 2d 328, 335 (1969), that "unconsciousness is never an affirmative defense."

The rationale of *Mercer* is that (1) one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness; (2) in every prosecution the State has the burden of establishing beyond a reasonable doubt the identity of the defendant and that he voluntarily committed the unlawful act charged; and (3) when it proves these essential elements of its case it necessarily disproves the defense of unconsciousness.

Seemingly the majority have concluded—in my view, entirely erroneously—that at one point in his charge the trial judge put upon defendant the burden of proving his defense of unconsciousness, and that unless we confess error in *Mercer* and now hold that unconsciousness is an affirmative defense, a new trial must be awarded for prejudicial error in this case. Since a charge must be construed contextually, in order to put in proper perspective defendant's exceptions to it, as well as the majority's analysis of it, the charge is briefed below in pertinent part.

In the beginning, immediately after reading the indictment, which charged defendant with kidnapping Catherine Sutton, Judge Martin instructed the jury as follows:

"The defendant has entered a plea of 'not guilty'. The fact that he has been indicted is no evidence of guilt. Under our system of justice, when a defendant pleads 'not guilty', he is not required to prove his innocence; he is presumed to be innocent. The State must prove to you that the defendant is guilty beyond a reasonable doubt."

Next, after briefly summarizing the evidence of both State and defendant and after defining kidnapping, the judge stated defendant's contention "that he had no knowledge of and did not consciously commit the act charged in the indictment, and that he was unconscious at the time the alleged act was made."

Subsequently, with reference to defendant's claim of unconsciousness, the court charged:

(D) "Now, members of the jury, as I have told you, the defendant contends that he was unconscious at the time that Catherine Sutton was taken from the driveway of her residence and put in an automobile and taken to a point two and a half miles away to an old sawmill road in Randolph County.

"Now, members of the jury, a person cannot be held criminally responsible for acts committed while he is unconscious. Unconsciousness is never an affirmative defense. Where a person commits an act without being conscious thereof, such act is not criminal even though if committed by a person who was conscious it would be a crime. *The defendant has no burden to prove that he was unconscious.* (If you find that the defendant was completely unconscious of what transpired when Catherine Sutton was taken violently from her driveway at her residence, put in an automobile and held down by an arm, and, thereafter, was beat about the head and sexually molested, by having fingers and a hand placed in her vagina, then he would not be guilty and it would be your duty to so find.) (E) (Emphasis added.)

\*     \*     \*

"So, members of the jury, the Court charges you that if you find from the evidence beyond a reasonable doubt that on or about the 16th day of March 1971, Willis Tony Caddell *wilfully and intentionally* took Catherine Sutton and carried

---

State v. Caddell

---

her from her residence, the driveway of her residence in Guilford County, to a point on an old sawmill road some two and a half miles away in Randolph County, against her will, by taking her forcibly from the driveway of her home, placing her in an automobile and taking her in the automobile to the place in Randolph County on an old sawmill road, and without lawful authority, and that this constituted a substantial carrying away, it would be your duty to return a verdict of guilty of kidnapping.

"However, if you do not so find or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty . . . . "

Defendant assigns as error that portion of the charge included above between the letters (D) and (E). Specifically, he contends that the sentence enclosed in parenthesis immediately preceding the letter (E) contains two prejudicial errors: (1) the judge assumed, and thereby expressed the opinion, that it was an established fact defendant had violently taken Catherine from her driveway, put her in an automobile and thereafter sexually assaulted her; and (2) the judge laid upon defendant the burden of proving unconsciousness, thereby making his plea an affirmative defense in contravention of *Mercer*.

With reference to contention (1) I will concede that any reader, considering the challenged sentence *out of context*, would be justified in assuming that defendant's identity as the kidnapper had been admitted or determined. However, the majority opinion disposes of this assignment of error by citing the well-established rule that "a charge must be construed contextually and as a whole," and then noting (1) that the judge had begun his charge by saying to the jury, "It is now your duty to decide from this evidence what the facts are"; (2) that immediately before reviewing the facts he told the jury the Court expresses no opinion or intimations of opinion as to what the facts are. . . . You can determine what the facts are from your consideration of the evidence in the case; (3) that immediately after reviewing the facts he again warned the jury that what "this evidence does show is a matter for you and you alone to consider, to weigh and pass upon"; and (4) that in his final mandate he told the jury to acquit defendant if they were not satisfied beyond a reasonable doubt that he "wilfully and intentionally took Catherine Sutton and carried her from her residence. . . . "

When the charge is considered "contextually and as a whole" I agree with the majority that the challenged sentence provides no basis for a new trial on the ground that the judge violated G.S. 1-180. By the same token, it seems to me utterly impossible that any juror could have construed this charge to place the burden of proof on defendant to establish his plea of unconsciousness.

As heretofore noted, at the beginning of the charge the jury were told the defendant had *no* burden to prove his innocence; that the burden was on the State to prove his guilt beyond a reasonable doubt. Later, in words too plain to be misunderstood, the judge charged that a person cannot be held criminally responsible for acts committed while he is unconscious even though such acts would be criminal if committed by a conscious person, and that *unconsciousness is never an affirmative defense.* He then said, *"The defendant has no burden to prove that he was unconscious. If you find that the defendant was completely unconscious of what transpired when Catherine Sutton was taken violently from her driveway . . . put in an automobile [etc.] . . . . he would not be guilty and it would be your duty to so find."* (Emphasis added.)

Defendant contends the last sentence in the preceding paragraph put the burden on defendant to establish his defense of unconsciousness notwithstanding the positive statement which immediately preceded it that defendant had no such burden. This contention, I believe, will not withstand analysis. The instruction, "If you find that defendant was completely unconscious of what transpired when Catherine Sutton was taken violently from her driveway at her residence . . . then he [defendant] would not be guilty and it would be your duty to so find," makes no reference to burden of proof. The sole import of this instruction is that defendant would not be guilty unless he *knowingly* committed the act on which the bill of indictment is based. The instruction as given was entirely correct. Had the jury made the finding that defendant was unconscious at the time of the kidnapping it would certainly have been its duty to acquit him of the charge.

Although I do not entertain the idea that the jurors were even momentarily confused by the challenged instruction, were we to assume the possibility that they might have been, surely their confusion was dispelled by the judge's final mandate to acquit defendant unless they were satisfied beyond a reason-

---

State v. Caddell

---

able doubt he *"wilfully and intentionally"* took Catherine Sutton without lawful authority from her driveway, placed her in an automobile and carried her into Randolph County. Proof beyond a reasonable doubt that defendant acted *wilfully* and *intentionally* negates unconscious action.

I can perceive no conflict between the judge's charge in this case and our decision in *Mercer*. On the contrary, the judge meticulously followed the law as laid down in that case. Hence, upon the present record, there is no need to consider whether the *Mercer* holding that unconsciousness is never an affirmative defense should be reaffirmed or overruled. Notwithstanding, the majority purport to overrule it upon the grounds stated in that opinion. Since I consider those grounds unsound I am constrained to express my contrary view.

In writing the well documented opinion in *Mercer*, Chief Justice Bobbitt pointed out that if a person is actually unconscious when he does an act which would otherwise be criminal, the absence of consciousness not only excludes the existence of any specific mental state, but also excludes the *possibility of a voluntary act* without which there can be no criminal liability. Unconsciousness, therefore, can never be an affirmative defense, which imposes the burden of proof upon the defendant, because the State has the burden of proving the essential elements of the offense charged, and "a voluntary act is an absolute requirement for criminal liability." LaFave and Scott, Criminal Law 181 (1972). Although the defense of unconsciousness "is sometimes explained on the ground that such a person could not have the requisite mental state for commission of the crime, the better rationale is that the individual has not engaged in a voluntary act." *Id.* at 337. "Criminal responsibility must be judged at the level of the conscious." *State v. Sikora,* 44 N.J. 453, 470, 210 A. 2d 193, 202 (1965).

In a specific-intent crime the State must prove that the accused voluntarily did a particular act for a specific purpose. Thus, in a prosecution for burglary in the first degree the State must prove that the defendant broke and entered an occupied dwelling (in the nighttime) with the specific intent to commit the felony alleged in the bill of indictment. *State v. Thorpe,* 274 N.C. 457, 164 S.E. 2d 171 (1968). A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder. *State v. McLaughlin,* 286

N.C. 597, 213 S.E. 2d 238 (1975) ; *State v. Hamby* and *State v. Chandler*, 276 N.C. 674, 174 S.E. 2d 385 (1970).

In prosecutions for "general-intent offenses" the State need only prove that the defendant intended to do the act which the law declares criminal. "[I]ntent in the meaning of the criminal law is present in all cases where the act is done voluntarily or willingly, that is, through no compulsion or lack of mental capacity." 1 Burdick, Law of Crimes § 129 j. (1946). "The general criminal intent necessary to convict is deduced from the doing of the criminal act." *See* Annot., 8 A.L.R. 3d 1246 *et seq.* (1966).

Common law kidnapping is a general-intent crime. As defined in our decisions, it is the unlawful taking and carrying away of a human being against his will by force, threats, or fraud. *State v. Dix*, 282 N.C. 490, 493, 193 S.E. 2d 897, 898 (1973). Thus, in kidnapping "the criminal intent is the intent to do the act prohibited." 1 Wharton Criminal Law and Procedure § 372 (1957). The purpose for which the person is kidnapped is immaterial. It is enough that the prohibited act is done voluntarily. *See* 51 C.J.S., *Kidnapping* § 1 (1967).

Whether the offense charged be a specific-intent or a general-intent crime, in order to convict the accused the State must prove that he voluntarily did the forbidden act. Here I note that in *In Re Winship*, 397 U.S. 358, 25 L.Ed. 2d 368, 90 S.Ct. 1068 (1970), in an opinion expressing the views of five members of the Court, Mr. Justice Brennan said: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364, 25 L.Ed. 2d at 375, 90 S.Ct. at 1073.

The plea of unconsciousness is analogous to a plea of accident or of alibi, neither of which is an affirmative defense. Each plea merely negates an essential element of the crime charged. The plea of accidental homicide imposes no burden upon the defendant because the State cannot convict unless it first proves that the killing was culpable. "The claim that the killing was accidental goes to the very gist of the charge, and denies all criminal intent, and throws on the prosecution the burden of proving such intent beyond a reasonable. doubt." *State v. Phil-*

*lips,* 264 N.C. 508, 513, 142 S.E. 2d 337, 340 (1965). When proof of defendant's presence at the scene of the crime charged is essential to his guilt, his plea that he was elsewhere and therefore could not have committed the crime is merely a denial of guilt, not an affirmative defense. To convict, the State must prove beyond a reasonable doubt that he was present at the scene and participating. "Such proof, of course, would demolish an alibi." *State v. Malpass* and *State v. Tyler,* 266 N.C. 753, 754, 147 S.E. 2d 180, 181 (1966). Similarly, proof of a voluntary act negates unconsciousness; voluntary action and unconsciousness cannot coexist.

When the State's evidence tends to show that, at the time in question, a defendant was "up and about," acting as if he had full possession of his faculties and knew what he was doing, it makes out a prima facie case of consciousness, and nothing else appearing, the law will assume he was conscious. *State v. Mercer,* 275 N.C. 108, 118, 165 S.E. 2d 328, 336. Thus no issue of unconsciousness or automatism arises until some evidence of it is adduced. If the defendant offers such evidence, or if it is elicited from the State's own witnesses, the jurors must determine whether they are satisfied beyond a reasonable doubt that defendant voluntarily committed the act. From the beginning of the case and throughout the trial the burden remains upon the State to establish defendant's guilt beyond a reasonable doubt. This rule is supported by both reason and authority.

In *Government of the Virgin Islands v. Smith,* 278 F. 2d 169 (3rd Cir. 1960), defendant, who was charged with involuntary manslaughter by automobile, defended on the ground that he was suddenly stricken by an epileptic seizure and was unconscious at the time of the accident which resulted in a death. In its findings, the trial court said that the question was whether defendant's evidence convinces the court that he had a seizure which rendered him unconscious. In awarding a new trial, the Court of Appeals said: "This was an erroneous statement of law for the defendant did not have the burden of convincing the court he had an epileptic seizure. On the contrary, his burden was merely to go forward with the evidence to the extent necessary to raise a doubt . . . as to the defendant's consciousness . . . ." *Id.* at 173. In arriving at this conclusion the Third Circuit Court of Appeals relied heavily upon the reasoning of the Supreme Court of California in *People v. Hardy,* 33 Cal. 2d 52, 198 P. 2d 865 (1948), which is briefed below.

In *Hardy,* the defendant, whose defense was unconsciousness, was convicted of first degree murder. On appeal she assigned as error the trial court's charge that when the evidence shows a defendant acted as if he was conscious the law presumes he was then conscious, and that presumption remains until overcome by a preponderance of evidence to the contrary. In ordering a new trial the court said that this instruction deprived the defendant of the benefit of the "cardinal rule in criminal cases that the burden rests on the prosecution to prove the offense beyond a reasonable doubt." *Id.* at 63-64, 198 P. 2d at 871.

"The mere fact that there is a presumption which tends to support the prosecution's case does not change the amount or quantum of proof which the defendant must produce. . . . The prosecution is required to prove the offense beyond a reasonable doubt and, in so doing, may rely on any applicable presumptions. The defendant, on the other hand, is not required to prove his innocence by a preponderance of the evidence, but only to produce sufficient evidence to raise a reasonable doubt in the minds of the jury. . . . 'Men are presumed to be conscious when they act as if they were conscious, and if they would have the jury know that things are not what they seem, they must impart that knowledge by affirmative proof.' This is merely another way of saying that defendant has the duty of going forward with the evidence, and it is entirely consistent with the rule that defendant has only the burden of producing evidence which would raise a reasonable doubt in the minds of the jury." *Id.* at 64-65, 198 P. 2d at 872. *Accord, People v. Wilson,* 66 Cal. 2d 749, 59 Cal. Rptr. 156, 427 P. 2d 820 (1967). *See Fain v. Commonwealth,* 78 Ky. 183, 39 Am. Rep. 213 (1879).

In *Bratty v. A.-G. for N. Ireland,* 3 All E.R. 523 (1961), a case from which the majority opinion quotes extensively but which does not support its conclusion, the Lord Chancellor and each of the four Lords who considered the case with him, expressed views in accord with those of *Hardy.*

The Lord Chancellor (Vicount Kilmur), while noting that "a defence of automatism is very near a defence of insanity," said, "Nevertheless, one must not lose sight of the overriding principle, laid down by this House in Woolmington's case (21), that it is for the prosecution to prove every element of the offence charged. One of these elements is the accused's state of mind; normally the presumption of mental capacity is suffi-

State v. Caddell

cient to prove that he acted consciously and voluntarily and the prosecution need go no further. But, if, after considering evidence properly left to them by the judge, the jury are left in real doubt whether or not the accused acted in a state of automatism, it seems to me that on principle they should acquit because the necessary mens rea—if indeed the actus reus—has not been proved beyond reasonable doubt. . . ." *Id.* at 531.

"My conclusion is, therefore, that once the defence have surmounted the initial hurdle to which I have referred and have satisfied the judge that there is evidence fit for the jury's consideration, the proper direction is that, if that eveidence leaves them in a real state of doubt, the jury should acquit." *Id.* at 532.

Lord Morris agreed that if, during the trial, defendant advanced the defense of unconsciousness in explanation of the act, "and if such explanation was so supported that it had sufficient substance to merit consideration by the jury, then the onus which is on the prosecution would not be discharged unless the jury, having considered the explanation, were sure that guilt in regard to the particular crime charged was established so that they were left in no reasonable doubt." *Id.* at 537.

Lords Tucker and Hodson each agreed with the views of both the Lord Chancellor and Lord Morris.

Lord Denning began his remarks by saying: " 'When dealing with a murder case the Crown must prove (a) death as the result of a voluntary act of the accused and (b) malice of the accused.' The requirement that it should be a voluntary act is essential, not only in a murder case, but also in every criminal case. No act is punishable if it is done involuntarily. . . ." He then noted that (1) an act is not involuntary "simply because the doer does not remember it . . . (or) could not control his impulse to do it" or "because it is unintentional or its consequences are unforeseen"; (2) automatism which results from drunkenness cannot lead "to a complete acquittal"; (3) "if the involuntary act proceeds from a disease of the mind, it gives rise to a defence of insanity, but not to a defence of automatism." These exceptions noted, Lord Denning perceived that "the category of involuntary acts is very limited." *Id.* at 532-533.

While Lord Denning did not doubt that there were "genuine cases of automatism and the like" he observed that "black-out" was a popular excuse and "one of the first refuges of a guilty conscience," and he doubted that without help of scientific evi-

State v. Caddell

dence the layman-juror could distinguish the genuine from the fraudulent. In his opinion the evidence of the defendant himself would *rarely* be a sufficient foundation for the defense unless supported by medical evidence which pointed to the cause of the unconsciousness. He was convinced, however, that "[o]nce a proper foundation is thus laid for automatism, the matter becomes at large and must be left to the jury. As the case proceeds, the evidence may weigh first to one side and then to the other; and so the burden may appear to shift to and fro. *But at the end of the day the legal burden* comes into play and requires that the jury should be satisfied beyond reasonable doubt that the act was a voluntary act." (Emphasis added.) *Id.* at 535-536.

The *decision* in *Bratty* was that the trial judge had not erred when he refused to submit to the jury defendant's defense of unconsciousness. In my view this was clearly correct, for the evidence was that the defendant remembered and gave the police a detailed account of the manner in which he had murdered his victim, and his only explanation for his conduct was that "something terrible" came over him and that he "didn't mean to do what really happened." *Id.* at 526. Obviously such testimony constituted neither a "proper foundation" nor "evidence fit to be left to the jury on the question."

In discussing the relationship between the defenses of automatism and insanity, the "Law Lords" noted that the defendant acquitted by reason of insanity could be detained in a hospital where he was not a continuing danger to the public, whereas one acquitted on the ground of unconsciousness was unconditionally released. LaFave and Scott have noted the judicial tendency to characterize instances in which the condition of unconsciousness is likely to recur as insanity rather than automatism so that the defendant may be committed. LaFave and Scott, Criminal Law § 44, p. 337 (1972).

It is quite obvious that judges everywhere distrust the plea of unconsciousness and apprehend that jurors may repose hasty confidence in it. I think, however, there is no need for such concern, since jurors are sensible people too. For example, the jurors who tried this case were no more impressed with defendant's plea of automatism than is this Court. In my view we can safely assume that ordinarily a defendant's unsupported plea of blackout will aid the prosecution rather than the defense. But however that may be, were we to deny a defendant the defense of

unconsciousness unless his testimony tending to establish unconsciousness be corroborated by medical testimony, we would violate a fundamental and long-established principle of our criminal jurisprudence—that defendant has no burden to prove his innocence and that he is entitled to testify in his own behalf. N. C. Const. art. I § 23 (1971) ; G.S. 8-54.

"In criminal trials the jury must try every pertinent issue of fact the evidence conduces to prove. When evidence is offered, the sole question for the court is, will it conduce to prove any fact material in the case? and if the law gives an affirmative response, the evidence must be admitted." *Fain v. Commonwealth, supra,* 78 Ky. at 188-189, 39 Am. Rep. at 216 (1879). "The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. . . . *That is a question* within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." *People v. Wilson, supra,* 66 Cal. 2d at 762, 59 Cal. Rptr. at 165, 427 P. 2d at 829 (1967).

It is quite possible that to require corroboration of a defendant's testimony that he was unconscious at the time the act with which he is charged was committed would, in effect, deprive an accused, who was actually unconscious at the time in question, of that plea. Presumably such a person would have no recollection of the acts with which he is charged. In such a case if his automatism resulted from a concussion of the brain caused by an injury or attack which he does not remember, he might well be in no position to provide the testimony upon which to base a hypothetical question an expert medical witness might answer in his favor. Unconsciousness resulting from unknown causes, or as the first manifestation or symptom of a previously undiagnosed condition or disease, might create similar problems.

In support of its thesis that the defense of automatism should be equated with the affirmative defense of insanity, the majority opinion says, "An affirmative defense is one in which the defendant says, 'I did the act charged in the indictment, but I should not be found guilty of the crime charged because. . . .' " A plea of unconsciousness, however, is not routinely one of confession and avoidance. Assuming a genuine case of unconsciousness—and the majority opinion concedes the possibility—the defendant who had been unconscious could not always know for certain whether he committed the act charged, and it therefore

State v. Caddell

seems most unlikely he would admit having done so. Of course, until the jury is satisfied beyond a reasonable doubt that the defendant indeed committed the act charged, his mental condition at the time is irrelevant. In this case the defendant did not admit he kidnapped Catherine. On the contrary he denied having done so.

Specifically, he said: "But if I did this, which I don't think I could—I never did a degrading thing like this before. I have been charged with nothing like this. I don't believe it. And if I did this, there is something wrong. . . . No, I have never seen the lady and didn't know who she was until I seen her walk up here on the stand. . . . I don't even know where she lives at. I never seen the lady before in my life, as far as I know. . . . I say I don't know nothing about driving a car out there."

The opinions in both *Mercer* and *Bratty* point out the fundamental difference in the pleas of insanity and automatism. A plea of insanity raises this question: Was the defendant, at the time he committed the offense charged, so incapacitated from *a disease of the mind* that he was incapable of knowing the nature and quality of his act, or if he did know, was he incapable of distinguishing between right and wrong with relation thereto? No such question arises upon a plea of unconsciousness. One who is completely unconscious *cannot* know the nature and quality of his act or judge whether it is right or wrong. He is incapable of any voluntary action. Automatism "means unconscious involuntary action, and it is a defence because the mind does not go with what is being done." Automatism is action by one who has no knowledge of action, "no consciousness of doing what was being done." *Bratty* at 527.

For the reasons stated herein I concur in the decision of the Court that there is no reversible error in the trial below, but I dissent from the statement in the majority opinion that unconsciousness is an affirmative defense. In my view unconsciousness, as held in *Mercer,* is never an affirmative defense.

Justice COPELAND joins in this dissenting opinion.