STATE OF NORTH CAROLINA v. WAYNE FIELDS

No. 302A88

(Filed 2 March 1989)

**Criminal Law § 5.2; Homicide § 7.1— murder case—instruction on unconsciousness required**

The trial court in a first degree murder case erred in refusing to instruct the jury on the defense of unconsciousness or automatism where members of defendant's family testified to a substantial history going back to defendant's childhood of defendant's acting as if he were "in his own world," and a clinical psychologist testified that in his opinion defendant was in a disassociative state and unable to exercise conscious control of his physical actions at the moment of the fatal shooting, and that defendant was acting like a robot or automaton. While there was evidence that defendant had been drinking on the night of the shooting, there was no evidence of the extent of his drinking or that his allegedly unconscious behavior resulted from voluntary drug or alcohol use.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1986) from the imposition of a sentence of life imprisonment upon his conviction of first degree murder before *Winberry, J.,* at the 19 January 1988 Criminal Session of Superior Court, EDGECOMBE County. Heard in the Supreme Court 14 December 1988.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Jimmie R. Keel for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of first degree murder after a noncapital trial. The trial court sentenced him to life imprisonment. We award a new trial for error in refusing a requested jury instruction.

The State's evidence, in pertinent summary, showed the following:

Connie Williams, defendant's half-sister, testified that she had been dating Isaiah Barnes, the victim, for two years at the time of his death. On 18 September 1986 the couple was drinking liquor at Robert Cobb's house. Defendant and his girlfriend were also at Cobb's house. Defendant left and returned alone several

hours later. Defendant gave Cobb a piece of paper, then shot Barnes twice. Barnes was sitting on a trunk unarmed when defendant shot him. Williams testified that Barnes sometimes beat her but had not touched her that evening. On cross-examination, Williams denied that Barnes had grabbed or touched her prior to the shooting.

Cobb testified that defendant and his girlfriend were at his house when Williams and Barnes arrived. Defendant offered Williams a drink and left soon thereafter. Before leaving, defendant "played some numbers" with Cobb. Williams and Barnes also left Cobb's house, but returned later that evening. Williams and Barnes were sitting on a trunk in Cobb's bedroom, drinking and talking. Cobb and his friend, Joyce Ann Pettaway, also were talking in the bedroom. Defendant entered the bedroom about midnight. He called Cobb by a nickname, "Snow." Defendant asked Cobb to keep the ticket for the numbers he had played, saying, "If I hit, I want you to get the money and keep it until you see me." Cobb asked why defendant could not keep it himself, and defendant answered, "You'll see."

Defendant and Barnes had not spoken to one another. Defendant then walked around the foot of the bed, pulled a gun out of his belt, and shot Barnes. Barnes fell on the floor. Pettaway cried, "Oh, Lord have mercy. Please don't shoot that man anymore." Defendant turned toward her and said, "Shut up," then shot Barnes again as he lay on the floor gasping for breath. Cobb told defendant to get out of his house because he was calling "the law." Defendant said, "Okay, Snow," and walked out.

Wallace Fields, defendant's brother, testified on defendant's behalf. He recounted the difficult circumstances of their childhood. Their stepfather, called "Dump," drank regularly and beat the children and their mother. They had little money and were often hungry. When Dump was on a rampage, the mother and children would often sleep outside to avoid him.

One night when defendant was fourteen, Dump held a knife to defendant's mother's throat and threatened to kill her. Defendant grabbed a gun and shot Dump, killing him. Wallace Fields testified that up to the time of this incident defendant was a normal boy who liked to play and go to school. After the shooting, defendant had nightmares and became "a different person," acting

as if he were "in his own world." Defendant was extremely devoted to his mother, helping her cook and clean and giving her money.

Wallace Fields further testified that his sister, Connie Williams, had become a different person since beginning her relationship with Barnes. She often appeared bruised and beaten and cared little for her appearance.

Willard Mills, defendant's stepbrother, also testified regarding defendant's devotion to his mother. Mills stated that Connie Williams became dependent on alcohol or drugs and lost all interest in her family and appearance after she became involved with Barnes. Defendant and his brothers were worried about Connie and frequently discussed how to help her.

Mills reported that defendant had become very morose after the childhood shooting incident. As defendant grew older, Mills advised him to put it all behind him and join the service. While in service, another soldier performed a trick in which the soldier put lighter fluid in his mouth, lit it, and blew out the flames. Defendant saw his stepfather's face in the flames and ran away. He was hospitalized for several months following this episode.

Mills testified that defendant was concerned about Barnes' drinking and tried to persuade him to stop, but that defendant bore Barnes no malice. Ten days after shooting Barnes, defendant called Mills. Mills picked up defendant at the bus station and took him to the Tarboro police station to turn himself in.

Agnes Williams, defendant's mother, testified that defendant's nerves had been bad ever since the incident with Dump. Defendant had a nervous breakdown in the service and was never the same afterward. Defendant's nerves were "just racked all to pieces" over Connie Williams' problems.

Dr. Evans Harrell, a psychologist, testified on defendant's behalf. His credentials included a bachelor's degree from the University of the South, a master's degree in psychology from the University of Florida, and a Ph.D. in clinical psychology from the University of Florida. He was also a diplomate in psychology, which he described as "analogous to being board certified in a medical specialty."

Dr. Harrell had obtained a personal and family history from defendant and members of his family. He stated that after defendant killed Dump he felt very protective toward his mother and sisters. Defendant felt guilty about the family being left without a father figure, and he tried to assume that role. Defendant suffered from frequent nightmares featuring Dump and often felt Dump's presence even when awake. In Dr. Harrell's opinion, defendant suffered from post-traumatic stress disorder and certain of his behavior was characteristic of a disassociative state. Dr. Harrell described a disassociative state as a sudden temporary alteration in the state of consciousness, during which defendant would not remember what happened and did not intend to do anything, "like his mind and his body weren't connected."

Dr. Harrell recounted what defendant related to him about the killing of Isaiah Barnes. Defendant told Dr. Harrell he had tried to get his sister Connie to leave Cobb's house that night because he was worried about her drinking. Connie's arm was bandaged from a burn which she attributed to an accident but which defendant and the family suspected Barnes inflicted. Defendant saw Barnes reach out and grab Connie, and Connie grimaced in pain. At this point defendant pulled out the gun and shot Barnes. Defendant told Dr. Harrell he had not planned to kill Barnes, had not thought of killing Barnes, and even as he shot him, was not thinking of killing Barnes. Defendant denied any memory of firing a second shot. Instead, defendant was seeing Dump and his mother "and all of these things flashing before [him] in a blur."

With this narrative as the basis of his opinion, Dr. Harrell testified that defendant perceived Barnes to be treating Connie the same way Dump had treated defendant's mother. This perception triggered a disassociative state in defendant the night of the killing. In Dr. Harrell's opinion, defendant did not plan or intend to shoot Barnes and was unable to exercise conscious control of his physical actions at that moment. Dr. Harrell concluded, "I think he was acting sort of like a robot. He was acting like an automaton."

Dr. Harrell testified that defendant told him he had been drinking on the night of the shooting but did not tell him how much he had had to drink.

Defendant assigns error to the trial court's refusal to instruct the jury on the defense of unconsciousness. This defense, also called automatism, has been defined

> as connoting the state of a person who, though capable of action, is not conscious of what he is doing. It is to be equated with unconsciousness, involuntary action [and] implies that there must be some attendant disturbance of conscious awareness. Undoubtedly automatic states exist and medically they may be defined as conditions in which the patient may perform simple or complex actions in a more or less skilled or uncoordinated fashion without having full awareness of what he is doing.

F. Whitlock, *Criminal Responsibility and Mental Illness* 119-20 (1963) (quoted in W. LaFave and A. Scott, *Criminal Law* § 4.9, at 382 (2d ed. 1986)). The rationale underlying the defense was explained as follows in *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969), *overruled on other grounds, State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975), the first case recognizing the defense in this jurisdiction: "The absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability." *Id.* at 116, 165 S.E. 2d at 334 (quoting 1 Wharton's Criminal Law and Procedure § 50, at 116 (1957)).

Defendant's evidence tended to show that immediately preceding and during the killing of his victim he was unconscious. Family members testified to a substantial history going back to defendant's childhood of defendant's acting as if he were "in his own world." In the context of this testimony, and on the basis of a personal and family history obtained from defendant and members of his family, Dr. Harrell testified that in his opinion defendant suffered from post-traumatic stress disorder and was prone to experiencing disassociative states. In Dr. Harrell's opinion, defendant was in a disassociative state when he shot the victim. Dr. Harrell testified:

> Q: All right. Now, based upon everything you've been told, and everything that,—and your history that you took from Wayne Fields—Do you have an opinion as to whether he was conscious of what he was doing at the time that the gun was fired on September 18, 1986?

A: I think he may have been conscious of it. He may have been conscious of it in the sense of—I mean, he remembers that part of it. But, he doesn't, but he, but when you ask him, you know, he doesn't—I mean, he remembers that it happened, but he didn't plan for it to happen. He didn't do it intentionally. And he doesn't even remember what happened immediately after that.

. . .

Q: Now, Doctor, again, based on all of the history and everything that you know about this case, do you have an opinion as to whether Wayne Field's [sic]—at the time of the firing of the gun on September 18th, 1986,—was able to exercise conscious control of his physical actions at that moment?

A: Yes, I do have an opinion.

Q: What is that opinion?

A: I don't think that he was. I mean, I think he was acting sort of like a robot. He was acting like an automaton.

On cross-examination, Dr. Harrell testified:

A: He remembers everything up to the point that Isaiah reached out for Connie's arm and Connie grimaced. He remembers everything until then. Or I'm not, I'm not contending that he doesn't remember.

Q: The only thing he essentially forgets is the shooting, isn't that true?

A: Okay. Well, what, when he goes into the altered state of consciousness, is when Isaiah reached out and grabs Connie's arm and Connie grimaces, and this whole past life and material that is so similar in his mind to what he's seen, flashes before him, then he engages in a motor action. . . . But, I'm not contending that his state of mind was anything different from yours and mine that evening up until the moment I've just described.

This testimony, if believed, permits a jury finding that defendant was unable to exercise conscious control of his physical actions when he shot the victim. "Where a defendant's evidence discloses facts which are legally sufficient to constitute a defense to the

crime with which he or she has been charged, the court is required to instruct the jury as to the legal principles applicable to that defense." *State v. Strickland*, 321 N.C. 31, 40, 361 S.E. 2d 882, 887 (1987). "What weight, if any, is to be given such evidence, is for determination by the jury." *Mercer*, 275 N.C. at 116, 165 S.E. 2d at 334. Defendant thus was entitled to the unconsciousness or automatism instruction. *See* N.C.P.I. — Crim. 302.10 (1986).

In *Mercer*, we quoted with approval from *People v. Wilson*, 66 Cal. 2d 749, 427 P. 2d 820, 59 Cal. Rptr. 156 (1967), which approved a jury instruction stating that the defense of unconsciousness

> does not apply to a case in which the mental state of the person in question is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of the unconsciousness of persons of sound mind as, for example, somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind.

*Mercer*, 275 N.C. at 118, 165 S.E. 2d at 336. The defendant in *Mercer* testified that his mind was blank when he shot his estranged wife. He last remembered her hollering at him to get off her porch or she would call the police. His next recollection was of standing on the porch holding the pistol. *Id.* at 114-15, 165 S.E. 2d at 333. We held that defendant was entitled to an instruction on unconsciousness as a complete defense. *Id.* at 115, 119, 165 S.E. 2d at 334, 336.

In *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975), defendant introduced evidence of both insanity and unconsciousness. We stated:

> The defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind. As a consequence, the two defenses are not the same in effect, for a defendant found not guilty by reason of

unconsciousness, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill.

*Id.* at 285, 215 S.E. 2d at 360.

In two subsequent cases we found no error in the refusal to instruct the jury on the unconsciousness defense when the defendant's allegedly unconscious behavior resulted from voluntary drug or alcohol use. In *State v. Williams*, 296 N.C. 693, 252 S.E. 2d 739 (1979), we said:

> In view of the overwhelming evidence that defendant's mental state at the time of the commission of the offenses in question was brought about by his excessive consumption of intoxicants, we hold that the trial court did not err in refusing to instruct the jury on the defense of unconsciousness.

*Id.* at 701, 252 S.E. 2d at 744. We quoted this passage with approval in a case in which all the evidence showed that defendant's allegedly unconscious behavior was caused by voluntary consumption of the drug known as "angel dust." *State v. Boone*, 307 N.C. 198, 209, 297 S.E. 2d 585, 592 (1982).

In *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983), the defendant broke into a home, shot the husband, stole money and ammunition, and abducted the wife. At the wife's request, the defendant called the rescue squad before leaving the house. Several times the wife disobeyed the defendant's commands without adverse consequences. The wife was able to convince the defendant to allow her to drive the car. The defendant told her to drive to Tennessee, but she drove toward town, convincing him that the car needed gas and the only place to get it was at a convenience store. Once there, he allowed her to get out of the car, despite the presence of a police car. The wife was able to communicate her situation to a police officer, who arrested the defendant. The defendant did not resist and handed the officer his gun. *Id.* at 243-46, 307 S.E. 2d at 341-42.

The defendant in *Jerrett* testified that he had experienced "blackouts" since serving in Vietnam. These blackouts would last for hours; he would drive, walk, and talk to people while unconscious, but would later remember nothing. He once pushed his sister to the floor while unconscious. He testified that on the

night of the murder he was experiencing a blackout up to the time the officer arrested him in the convenience store.

The defendant's parents there both testified that they had witnessed his blackouts on numerous occasions since his return from Vietnam. A psychiatrist testified that he was familiar with post-traumatic stress disorder but did not diagnose defendant as suffering from the syndrome. In the psychiatrist's opinion the defendant would have been capable of forming the intent to commit the acts with which he was charged. *Id.* at 246-48, 307 S.E. 2d at 342-43.

Based on this evidence, we held that the trial court should have given the requested instruction on unconsciousness. *Id.* at 266, 307 S.E. 2d at 353.

Pursuant to the foregoing authorities, defendant's evidence here likewise merited the requested instruction on unconsciousness or automatism. While there was evidence that defendant had been drinking on the night of the shooting, there was no evidence of the extent of his drinking or that his allegedly unconscious behavior resulted from voluntary drug or alcohol use. As noted above, family members testified to a substantial history going back to defendant's childhood of defendant's acting as if he were "in his own world." In the context of this testimony, and on the basis of a personal and family history obtained from defendant and family members, Dr. Harrell clearly testified that in his opinion defendant was unable to exercise conscious control of his physical actions at the moment of the fatal shooting. He stated further: "I think he was acting sort of like a robot. He was acting like an automaton. . . . [W]hen he goes into the altered state of consciousness, . . . then he engages in a motor action." This testimony, combined with the family members' testimony, if accepted by the jury, "exclude[d] the possibility of a voluntary act without which there can be no criminal liability." *Mercer*, 275 N.C. at 116, 165 S.E. 2d at 334 (quoting 1 Wharton's Criminal Law and Procedure § 50, at 116 (1957)). Therefore, an instruction on the legal principles applicable to the unconsciousness or automatism defense was required. *See Strickland*, 321 N.C. at 40, 361 S.E. 2d at 887.

This Court stated in *Caddell* that the defenses of insanity and unconsciousness "are not the same in effect, for a defendant

found not guilty by reason of unconsciousness, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill." *Caddell*, 287 N.C. at 285, 215 S.E. 2d at 360. This statement is potentially misleading. Such a defendant is subject to involuntary commitment to a facility for the mentally ill if found, in a civil commitment proceeding, to be "mentally ill and either dangerous to himself or others or in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." N.C.G.S. § 122C-261(a) (1986). *See* generally N.C.G.S. § 122C-251 *et seq.* (1986).

Because defendant's other assignments of error are unlikely to recur upon retrial, we do not discuss them.

New trial.