IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-59

No. COA21-93

Filed 1 February 2022

Burke County, No. 18 CRS 050914

STATE OF NORTH CAROLINA

v.

DARIUS HEASLEY KING, Defendant.

Appeal by Defendant from judgment entered 17 March 2020 by Judge Alan Z. Thornburg in Burke County Superior Court. Heard in the Court of Appeals 2 November 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Marc Bernstein, for the State.*

*Hynson Law, PLLC, by Warren D. Hynson, for Defendant.*

GRIFFIN, Judge.

¶ 1 Defendant Darius Heasley King appeals from the trial court's judgment entering a jury verdict finding Defendant guilty of first-degree murder. Defendant contends (1) the State failed to present substantial evidence of premeditation and deliberation; (2) the trial court committed plain error by failing to instruct the jury *ex mero motu* on the defense of automatism; (3) the trial court abused its discretion by not intervening *ex mero motu* to prevent improper juror questioning during *voir dire*; and (4) the trial court reversibly erred by not intervening *ex mero motu* to prevent

improper remarks in the State's closing statement. We discern no error.

## I. Factual and Procedural Background

¶ 2 This case arises out of the murder of Hubert Roland Hunter, Jr., by Defendant in Hunter's apartment on 24 March 2018. The evidence at trial tended to show as follows:

¶ 3 Defendant and Hunter lived across the hall from one another in the Sienna apartment complex in Morganton. Mary Williams lived in the apartment directly underneath Hunter. Around midnight on the night of 24 March 2018, Williams heard a "big ruckus upstairs" coming from Hunter's apartment and thought someone "was just playing or something." Williams heard a "whole lot of stomping and moving around and shuffling", but was not concerned because she routinely heard running noises coming from Hunter's apartment. Williams did not call the police.

¶ 4 The next afternoon, two of Hunter's friends attempted to visit with Hunter at his apartment and instead found his body lying on the apartment floor. Hunter's friends called the police. Police arrived at Hunter's apartment and discovered his body still lying on the floor, surrounded by signs of an altercation. Hunter's body was lying face-down across the threshold between his bedroom and hallway, blood staining the side of his face and his right arm bent behind his back. A plastic bag and an orange and blue sweatshirt were on the floor near Hunter's head. Bloodstains scattered the nearby floor and walls. Three kitchen drawers were left open. In the

living room, an area rug was "[b]unched up" and the couch and other furniture were in disarray.

¶ 5        Shortly thereafter, a maintenance worker with the Sienna apartment complex reported to police that he discovered a white plastic bag containing bloodstained clothing in a dumpster behind the apartments. Police recovered the bag from the dumpster, and found a pair of jeans and an eight-inch kitchen knife inside the bag. The jeans and knife were also stained with what appeared to be blood.

¶ 6        The State conducted DNA analysis on items found in Hunter's apartment and the dumpster. DNA on the knife and a section of the orange and blue sweatshirt matched Hunter's DNA. DNA found on the knife also indicated a second, minor contributor, but the analysis was inconclusive and the State could not determine whether Defendant "did or did not handle the handle of the knife." The collar of the sweatshirt and the waist of the jeans contained DNA matching Defendant. The State's medical examiner also examined the injuries on Hunter's body. Hunter sustained three stabbing and slashing wounds to his neck, one of which was deep enough to fracture his spine. He also sustained blunt force injuries to his head, arms, and legs. Additionally, the medical examiner identified evidence of hemorrhaging in Hunter's blood vessels, neck muscles, and tongue, which led the medical examiner to conclude that strangulation was the ultimate cause of Hunter's death.

¶ 7        Law enforcement interviewed Defendant multiple times. The State played

recordings of Defendant's interviews for the jury. During the first interview on 26 March 2018, Defendant told law enforcement that, though he knew Hunter, he did not know Hunter had been killed, did not know any reason why Hunter would have been killed, and personally would not have fought with Hunter.

¶ 8        Law enforcement arrested Defendant and interviewed him again the next day. During this second interview, Defendant told law enforcement that he went to Hunter's apartment on March 24 to collect three dollars that Hunter owed him for a cell phone. Defendant said that Hunter refused to pay him. Defendant explained that he threatened to "beat the [expletive] out of [Hunter]", and Hunter "pulled a knife" in response. Defendant then "walked up on [Hunter]" and the two began fighting. Defendant admitted that he punched Hunter, choked him, and put the plastic bag over his head, but denied stabbing Hunter. According to Defendant, Hunter held the knife during the entirety of the fight and was incidentally stabbed in the neck while Hunter and Defendant wrestled. Defendant admitted that he took the knife out of Hunter's neck, then threw his own bloodstained jeans and the knife into the dumpster behind the apartment complex.

¶ 9        Throughout the second interview, Defendant maintained that he fought in self-defense after Hunter grabbed the knife. Defendant told law enforcement that he believed Hunter wanted to hurt him with the knife. Defendant insisted Hunter had used the knife to cut him, and showed law enforcement cuts on his hands and arms.

Defendant admitted that he had choked Hunter in an attempt to make him pass out and stop fighting. Defendant claimed that he had also passed out at some point during the struggle, and that he had "blacked out" and "go[ne] off" out of anger.

¶ 10 Law enforcement took Defendant to the magistrate's office following his arrest, where Defendant gave a third interview to news media. Defendant once again explained that he went to collect money from Hunter, then beat Hunter with his fists in self-defense when Hunter pulled out a knife.

¶ 11 Defendant presented a single witness before the jury, a friend who testified that he was with Defendant most of the day and evening on 24 March 2018 and claimed Defendant never mentioned Hunter. At the close of the State's evidence and at the close of all evidence, Defendant moved to dismiss the charge of first-degree murder, arguing the State failed to show sufficient evidence of premeditation and deliberation. The trial court denied both motions. The jury found Defendant guilty of first-degree murder. The trial court entered judgment on the jury's verdict and sentenced Defendant to life imprisonment without the possibility of parole. Defendant gave notice of appeal in open court.

## II. Analysis

### A. Preservation

¶ 12 Defendant filed a conditional petition for writ of certiorari alongside his brief on appeal, asking this Court to consider his appeal of the trial court's judgment in the

event that defense counsel's oral notice of appeal was insufficient. Rule 4 of the North Carolina Rules of Appellate Procedure states that a party may "appeal from a *judgment* or order of a superior or district court rendered in a criminal action" by "giving oral notice of appeal at trial," and such notice "shall designate the *judgment* or order from which appeal is taken and the court to which appeal is taken[.]" N.C. R. App. P. 4(a)(1), (b) (emphasis added).

¶ 13    Here, defense counsel informed the trial court in open court: "With respect to jury's verdict, we enter a notice of appeal." Defense counsel did not specifically state that Defendant sought to appeal from the trial court's *judgment* entering the jury verdict. Nonetheless, Defense counsel's words were clear enough to convey Defendant's intent to appeal his first-degree murder conviction to this Court. Furthermore, both parties have complied at each stage of the appellate process and the State has not been prejudiced by the imperfect wording of Defendant's appeal. *See State v. Daughtridge,* 248 N.C. App. 707, 712, 789 S.E.2d 667, 670 (2016) (holding the "[d]efendant's oral notice of appeal was sufficient to confer jurisdiction upon this Court" even though defense counsel's language was "not a model of clarity," where the language "manifest[ed] [the d]efendant's intention to enter a notice of appeal" and "the State [did] not contend that it was misled or prejudiced in any way by any defect in [the d]efendant's notice of appeal"). Therefore, we hold that Defendant's oral notice of appeal sufficiently conferred jurisdiction on this Court. We dismiss Defendant's

conditional petition for writ of certiorari as moot.

¶ 14    However, Defendant has preserved for review only the trial court's judgment entering the jury's verdict convicting him of first-degree murder. In his brief on appeal, Defendant includes factual and procedural history from a pre-trial hearing regarding Defendant's competency to stand trial. The Record contains no notice of appeal challenging the trial court's decision from the competency hearing. Therefore, we consider only the evidence presented in Defendant's first-degree murder trial in our review.

### B. Premeditation and Deliberation

¶ 15    Defendant contends the trial court erred by denying his motion to dismiss by arguing "there was insufficient evidence of premeditation and deliberation to support first-degree murder."

¶ 16    We review the trial court's denial of a motion to dismiss to determine whether, in the light most favorable to the State, "there [was] substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). This Court's review is "concerned only about whether the evidence [was] sufficient for jury consideration, not about the weight of the evidence." *State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455–56 (2000) (citation omitted). "Contradictions and discrepancies do not warrant dismissal of the

case but are for the jury to resolve." *Id.* at 379, 526 S.E.2d at 455 (citation omitted).

¶ 17 "First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Thomas*, 350 N.C. 315, 346, 514 S.E.2d 486, 505 (citation omitted), *cert. denied*, 528 U.S. 1006 (1999). "'Premeditation means that the act was thought over beforehand for some length of time,' however short." *State v. Leazer*, 353 N.C. 234, 238, 539 S.E.2d 922, 925 (2000) (citation omitted). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by legal provocation or lawful or just cause." *State v. Trull*, 349 N.C. 428, 448, 509 S.E.2d 178, 191 (1998) (citation omitted). "Premeditation and deliberation are mental processes which are ordinarily . . . prove[n] by circumstantial evidence." *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). Our Courts have found that the following circumstances can evidence premeditation and deliberation:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Id.* (citation omitted).

Defendant's conduct immediately before, during, and after the altercation with Hunter provides sufficient, substantial evidence of premeditation and deliberation. The State's evidence showed that Defendant went to Hunter's apartment because he believed Hunter possessed money that rightfully belonged to him, and demanded that Hunter give it to him. Defendant threatened to "beat the [expletive] out of [Hunter]." *See State v. Potter*, 295 N.C. 126, 131, 244 S.E.2d 397, 401 (1978) (holding that "evidence of [the] defendant's earlier threats against deceased[ and] his statements made shortly after the killing" allowed "legitimate inferences of premeditation and deliberation to be drawn"). The State's medical examiner also testified that Hunter sustained three stabbing and slashing wounds to his neck, fracturing his spine; blunt force injuries to his head, arms, and legs; and hemorrhaging in his blood vessels, neck muscles, and tongue. *See State v. Robbins*, 319 N.C. 465, 511–12, 356 S.E.2d 279, 306 (1987) ("[T]he nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred." (citation omitted)). Defendant did not call the police after he fought with Hunter, or otherwise seek medical assistance. Rather, Defendant went home and slept, then disposed of his bloodied jeans and the knife in a dumpster the next day. *See State v. Taylor*, 362 N.C. 514, 532, 669 S.E.2d 239, 257 (2008) ("[The defendant's] attempts to cover up his participation in the murder also support a finding of premeditation and deliberation." (citation omitted)); *State v. Sierra*, 335 N.C. 753, 759, 440 S.E.2d 791, 795 (1994)

(considering as evidence of premeditation and deliberation that "[a]fter the shooting, [the] defendant returned home, hid the murder weapon, and went to sleep"). In the light most favorable to the State, there was sufficient evidence of premeditation and deliberation to submit the charge of first-degree murder to the jury.

¶ 19       Defendant contends the evidence that he "blacked out when [Hunter] got that knife in his hand" and that Hunter attacked Defendant with the knife "fatally undermined the State's theory of premeditation and deliberation" because the evidence showed that Defendant fought Hunter "in a state of passion" in response to "sufficient provocation" by Hunter. *See State v. Corn*, 303 N.C. 293, 298, 278 S.E.2d 221, 224 (1981) (holding insufficient evidence of premeditation and deliberation where "*[a]ll* the evidence tend[ed] to show that [the] defendant shot [the victim] after a quarrel, in a state of passion, without aforethought or calm consideration" (emphasis added)); *State v. Huggins*, 338 N.C. 494, 498, 450 S.E.2d 479, 482 (1994) ("[W]ords or conduct not amounting to an assault or a threatened assault *may* be enough to arouse a sudden and sufficient passion in the perpetrator to negate deliberation[.]" (emphasis added) (citations omitted)). However, this was only some of the evidence presented to the jury. There was other substantial evidence, as described above, which was sufficient to submit the issue of premeditation and deliberation to the jury, and it was for the jury to weigh the evidence presented. *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455–56.

¶ 20      The trial court did not err by denying Defendant's motion to dismiss the charge of first-degree murder.

**C.  Jury Instruction on Defense of Automatism**

¶ 21      Defendant argues that the trial court "plainly erred in failing to instruct on the complete defense of automatism where that instruction was a substantial feature of the case arising from the evidence."  Defendant acknowledges that neither party requested a jury instruction on automatism and, therefore, the issue was not preserved for review by this Court.  "[U]npreserved issues related to jury instructions are reviewed under a plain error standard[.]"  *State v. Collington*, 375 N.C. 401, 410, 847 S.E.2d 691, 698 (2020).  "Defendant is entitled to relief only if the instructions amounted to plain error, which is error so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached."  *State v. Gainey*, 355 N.C. 73, 106, 558 S.E.2d 463, 484 (2002) (citation, quotation marks, and internal marks omitted).

¶ 22      The trial court has a duty to instruct the jury on all substantive features of the case, regardless of whether a particular instruction is requested by a party.  *State v. Loftin*, 322 N.C. 375, 381, 368 S.E.2d 613, 617 (1988).  "All defenses arising from the evidence presented during the trial constitute substantive features of a case and therefore warrant the trial court's instruction thereon."  *Id.* (citation omitted).  However, "the trial court should never give instructions that are not supported by a

reasonable view of the evidence." *State v. Clark*, 324 N.C. 146, 162, 377 S.E.2d 54, 64 (1989) (citation omitted); *see id.* ("[E]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict, and should not be left to the jury." (citation omitted)).

¶ 23        Automatism, or unconsciousness, is a "complete defense to a criminal charge . . . because '[t]he absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability.'" *State v. Jerrett*, 309 N.C. 239, 264–65, 307 S.E.2d 339, 353 (1983) (citation omitted). Automatism is, "under the law of this State, . . . an affirmative defense; and [] the burden rests upon the defendant to establish this defense, unless it arises out of the State's own evidence, to the satisfaction of the jury." *State v. Caddell*, 287 N.C. 266, 290, 215 S.E.2d 348, 363 (1975). Our Court has stated that if "the evidence of unconsciousness 'arises out of the State's own evidence,' the burden rests on the State to prove the defendant's consciousness beyond a reasonable doubt." *State v. Tyson*, 195 N.C. App. 327, 331, 672 S.E.2d 700, 704 (2009) (citation omitted).

¶ 24        During its case-in-chief, the State presented recordings of each of Defendant's interviews with law enforcement and the news media. Recordings from Defendant's second interview included multiple instances of Defendant stating that he "blacked

out" during his altercation with Hunter. "I didn't know what was going on in my mind[,]" Defendant continued, "I didn't know what I was doing . . . when I go off, I black out like that." "I blacked out when he got that knife in his hand. That's all I remember." However, although Defendant repeatedly stated that he had "blacked out", he was able to describe his fight with Hunter with great detail and told law enforcement that he "knew what was going on." No other evidence presented during either the State's case-in-chief or during Defendant's presentation of evidence tended to show that Defendant was unconscious during his altercation with Hunter, or that Defendant had any history of concerns with unconsciousness.

¶ 25      This evidence did not warrant an instruction on automatism. Defendant's own self-serving statements were insufficient evidence to satisfy a reasonable jury that Defendant lacked consciousness. Our Courts have recognized in a myriad of circumstances that the evidence must include something more than a defendant's self-serving statements to substantively support a jury instruction. *See State v. Thomas*, 350 N.C. 315, 347, 514 S.E.2d 486, 506 (1999) (citation omitted) (holding trial court did not err by not giving jury instruction on second-degree murder where "the only evidence offered by defendant to negate first-degree murder was his own testimony denying his involvement in the crime"); *State v. Smith*, 347 N.C. 453, 464, 496 S.E.2d 357, 363 (1998) (holding the defendant's self-serving statements that he lacked requisite intent were insufficient evidence to rebut elements of the crime

charged); *see also State v. Stanton*, 319 N.C. 180, 191, 353 S.E.2d 385, 392 (1987) ("Testimony of a self-serving declaration made by a defendant following an alleged crime is incompetent as substantive evidence." (citation omitted)). Furthermore, our Courts have traditionally held that a jury instruction on automatism was appropriate based on evidence beyond a defendant's own self-serving statements. *Jerrett*, 309 N.C. at 266, 307 S.E.2d at 353 (holding automatism instruction was appropriate where the defendant, his parents, and two psychiatrists all testified to his history of black-outs); *State v. Fields*, 324 N.C. 204, 212, 376 S.E.2d 740, 744–45 (1989) (holding evidence supported automatism instruction where the defendant, his family, and an expert witness testified that defendant had a history of being "in his own world"); *Tyson*, 195 N.C. App. at 331, 672 S.E.2d at 704 (holding evidence gave rise to jury instruction on automatism where State's witnesses testified to drugging the defendant until he was unresponsive before engaging in sexual acts with him).

¶ 26 This case is similar to *State v. Boyd*, 343 N.C. 699, 473 S.E.2d 327 (1996). In *Boyd*, the defendant argued "that his own uncontradicted testimony was sufficient evidence from which the jury could have found that he was unconscious[.]" *Id.* at 713, 473 S.E.2d at 334. During the trial, the defendant testified that "he could not remember many of his actions on the day of the crimes[.]" *Id.* at 714, 473 S.E.2d at 334. The *Boyd* Court noted that the defendant "pointed only to his own testimony at trial as evidence to support an instruction on unconsciousness" and that, despite his

claims of memory loss, the defendant "was able to recall many of the graphic details of the murders as shown by the inculpatory statement he gave to police within hours of committing the murders." *Id.* (citation omitted). Further, although expert witnesses testified for the defendant, "neither of [the] defendant's expert witnesses gave testimony in support of [the] defendant's unconsciousness claim." *Id.* at 715, 473 S.E.2d at 335. The *Boyd* Court held "the trial court did not err by refusing to instruct the jury on unconsciousness" because the defendant "relie[d] only upon his own self-serving testimony at trial that [was] wholly contradicted by the statement he gave to police within hours of committing the murders." *Id.*

¶ 27    In the present case, Defendant points only to his own self-serving statements made in his second interview to law enforcement within forty-eight hours of his altercation with Hunter. The single witness that Defendant presented to the jury did not give testimony supporting Defendant's alleged history of "black[ing] out" and "go[ing] off." Rather, Defendant told law enforcement in the interview that he "blacked out" once Hunter pulled out the knife, that he did not know "what was going on in [his] mind", and assured law enforcement "[t]hat's all I remember." Defendant also stated that he "knew what was going on" and further recounted specific details of the altercation that occurred after Hunter got the knife, including claims that he beat Hunter with his fists, that he choked Hunter, and that Hunter incidentally stabbed himself in the neck with the knife. Defendant's ability to recount the events

of the altercation contradicted his claims of memory loss in the same interview.

¶ 28        That this evidence arose from the State's case-in-chief does not change our conclusion. The State had no need to provide additional evidence to satisfy a burden of proof that Defendant was awake because Defendant's self-serving statements were not enough to reasonably show unconsciousness. *Cf. Tyson*, 195 N.C. App. at 331, 672 S.E.2d at 704 (holding the State had burden to show the defendant was actually conscious where its own witnesses testified that they caused the defendant to be unconscious during the time of the offense). Here, no sufficient evidence of automatism "arose out of the State's own evidence." *Id.* The trial court did not err by not giving an instruction on automatism of its own accord. Defendant's statements in the interview recordings were not evidence from which a reasonable juror could find automatism, and therefore we cannot say an instruction on automatism would have had a probable impact on the outcome of this case.

**D. Impermissible Questioning During Voir Dire**

¶ 29        Defendant asserts that the trial court abused its discretion by not intervening *ex mero motu* during the State's *voir dire* of prospective jurors when the State asked "clearly improper" questions which "exceeded the permissible boundaries of *voir dire*." "The nature and extent of the inquiry made of prospective jurors on *voir dire* ordinarily rests within the sound discretion of the trial court." *State v. Bond*, 345 N.C. 1, 17, 478 S.E.2d 163, 171 (1996) (citation omitted), *cert. denied*, 521 U.S. 1124

(1997). "[D]efendant must show abuse of discretion and prejudice to establish reversible error relating to *voir dire.*" *State v. Bishop*, 343 N.C. 518, 535, 472 S.E.2d 842, 850 (1996).

¶ 30    During *voir dire*, counsel's "attempts to 'stake out' a prospective juror in advance regarding what his decision might be under certain specific factual scenarios are improper." *State v. Jaynes*, 353 N.C. 534, 549, 549 S.E.2d 179, 192 (2001) (citation omitted). "Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided." *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980). "Jurors should not be asked what kind of verdict they would render under certain named circumstances." *Id.* In *State v. Jaynes*, our Supreme Court held that questions which sought to "pin down the prospective jurors regarding specific mitigating circumstances that would sway them towards a life sentence" did "not amount to proper inquiries into whether the prospective jurors could follow the law or the trial court's instructions." *Jaynes*, 353 N.C. at 550, 549 S.E.2d at 192. However, the defendant did not challenge questions which asked a juror to explain why she did not believe in the death penalty, and the Court held that the juror was properly excluded when those questions clarified that the juror's "views of the death penalty would have prevented or substantially impaired the performance of her duties." *Id.* at 552, 549 S.E.2d at 194.

¶ 31     Essentially, there is a range of unacceptable to acceptable questions. On one end, unacceptable questions tend to ask a juror, "If the evidence shows a particular set of facts, what would you decide?" or "What facts would you need to hear in order to convict this defendant?" On the other end, acceptable questions ask, "Do you acknowledge or believe in the concepts integral to this case?" The trial court has discretion to decide where an attorney's question falls on this spectrum.

¶ 32     Defendant asserts that the following questions from the State warranted *ex mero motu* intervention by the trial court because they posed hypotheticals that were inappropriately similar to the facts of this case:

> "Does anybody think that a verbal argument justifies the use of physical violence?"
>
> "Does everybody believe if you couldn't retreat, then you think you have the right to defend yourself?"
>
> "Does anyone not believe in the concept of self-defense? In other words, you think – I will use this example: Jesus teaches that you turn the other cheek. Does anyone believe that's the way it ought to be? If somebody punches me in the face, I should just turn and walk away and not defend myself? Anybody really believe that? Again, nothing wrong with that, I am just making sure."
>
> "If you were in fear for your life and had a weapon, would you defend yourself or would you run away?"

¶ 33     The trial court did not abuse its discretion because the State did not ask the jurors to consider specific circumstances and forecast their ultimate verdict. Mere

mention of a weapon, a verbal argument, or an inability to retreat did not amount to an inappropriate "stake out" using fact-specific hypotheticals. Instead, the State asked the jurors whether they could agree with the law of self-defense as it exists in North Carolina: a defendant may use lethal force when he reasonably believes such force is necessary to prevent death or bodily harm arising from a fight he did not initiate. *See State v. Greenfield*, 375 N.C. 434, 441, 847 S.E.2d 749, 755 (2020). Each of the State's questions reasonably asked: "Would you be willing to accurately apply the law of self-defense if presented with facts that qualify under the law?" Just as counsel in *Jaynes* permissibly inquired whether the juror could ever agree with the death penalty, the State here acceptably asked the jurors whether they could personally agree with the law of self-defense, a matter integral to the resolution of this case. The questions asked in this case were proper inquiries as to whether the jurors believed in and would follow the applicable law. *See State v. Robinson*, 339 N.C. 263, 273, 451 S.E.2d 196, 202 (1994).

**E. Closing Arguments**

¶ 34      Lastly, Defendant argues the trial court "reversibly erred by not intervening *ex mero motu* in the State's closing argument when the State claimed . . . that [Defendant], not [Hunter], handled the knife in question, thereby misleading the jury on the central issue at trial: self-defense." Defendant did not object to the State's statements during closing arguments. "The standard of review for assessing alleged

improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).

¶ 35        "It is well settled that the arguments of counsel are left largely to the control and discretion of the trial judge and that counsel will be granted wide latitude in the argument of hotly contested cases." *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986) (citations omitted). Counsel's closing arguments may include both facts presented during trial and any reasonable inferences drawn from those facts in support of their case. *Id.* (citation omitted). Counsel "may not argue to the jury facts not in evidence nor travel outside the record by injecting his personal views and beliefs." *State v. Monk*, 291 N.C. 37, 53, 229 S.E.2d 163, 173 (1976) (citation omitted). "[D]efendant must show that [counsel's] comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998) (citation omitted).

¶ 36        Defendant contends that it was impermissible for the trial court to allow the State to assert during closing arguments that "[Hunter] never got a knife"; that cuts on Defendant's hands "didn't come from a knife because [Hunter] never had a knife"; and that Defendant went into Hunter's kitchen, acquired the knife himself, and stabbed Hunter. Contrary to Defendant's assertion that "the evidence only pointed

in one direction: that [Hunter] handled the knife, not [Defendant]", the State's closing statement was supported by evidence presented at trial. The uncontradicted evidence at trial was that neither Hunter nor Defendant had the knife when they first began arguing. One of them acquired the knife at some point during their altercation. The evidence showed that three drawers were left open in Hunter's kitchen, Hunter was ultimately stabbed multiple times with a kitchen knife, and Defendant took the knife with him when he left Hunter's apartment. DNA analysis conclusively found Hunter's DNA on the knife, but also found a separate, inconclusive DNA profile on the knife. Even though Defendant admitted that he possessed the knife after the altercation and threw it in the dumpster, the DNA analysis did not reveal "whether [Defendant] did or did not handle the handle of the knife."

¶ 37        The State argued to the jury that, at some point during their altercation, Defendant rummaged through Hunter's kitchen drawers, found a knife, left the drawers open, and then used the knife to stab Hunter. This series of events directly contradicted Defendant's theory of self-defense, but did not contradict the evidence presented at trial or rely on evidence outside of the trial record. Rather, the State's closing arguments drew reasonable inferences from the evidence presented. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. The trial court did not commit error, much less reversible error, by failing to intervene *ex mero motu* in the State's closing argument. *Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

### III.   Conclusion

We hold that Defendant received a fair trial, free from error.

NO ERROR.

Judge JACKSON concurs.

Judge MURPHY concurs in result only.